**PURITAN INSURANCE COMPANY, Appellee,**

v.

**CANADIAN UNIVERSAL INSURANCE COMPANY, LTD., d/b/a Canadian Universal Insurance Company, Inc., Appellant.**

No. 85–1002.

United States Court of Appeals, Third Circuit.

Argued Aug. 13, 1985.
Decided Oct. 15, 1985.

Steve A. Cozen (argued), Miles A. Jellinek, Richard C. Bennett, Cozen, Begier & O'Connor, Philadelphia, Pa., for appellant.

Lawrence M. Silverman (argued), Joel D. Rosen, Astor, Weiss & Newman, Philadelphia, Pa., for appellee.

Before ADAMS, GIBBONS, and WEIS, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

An insurance company which had issued an excess policy received a judgment against the primary carrier because of its failure to settle a claim that had resulted in an unfavorable verdict against their common insured. On this appeal we hold that under applicable Pennsylvania law an excess insurer's rights against a primary carrier are based on equitable subrogation to those of the insured. When the decision to try, rather than settle, a personal injury suit is approved by the insured, neither it nor the excess insurer may recover from the primary carrier when the verdict exceeds the primary policy limits. Since the record demonstrates that to be the situation here, we will reverse the district court's judgment.

After a nonjury trial, the district court found that by failing to settle a claim against its insured, defendant primary carrier had acted in bad faith. Plaintiff, as excess insurer, was therefore entitled to a judgment for the sums it had paid over and above primary coverage. Defendant has appealed.

This case had its genesis in a products liability suit brought by Ricky Donahue against the Northwest Engineering Company. Donahue was seriously injured when the boom of a crane manufactured by Northwest fell on him. The case was tried in early 1981 and resulted in a verdict against Northwest in the amount of $1,413,152.35, which was later settled for $1,375,000.

At the time of the accident, defendant Canadian Universal Insurance Company insured Northwest under a primary liability policy with upper limits of $500,000 but subject to a $100,000 deductible. Plaintiff Puritan Insurance Company had issued a separate policy to Northwest with limits of $5,000,000 but excess to that of the primary carrier.

The Donahue trial was bifurcated. Before trial, Canadian refused to offer the $500,000 policy limit but did make such a tender after the jury had found Northwest liable. After settling the case, Puritan sued Canadian for the $850,000 expended above the primary limit and sought punitive damages as well.

In the Donahue litigation, the plaintiff's theory was that the operator of the crane, while turning in his seat to operate a control located behind him, inadvertently hit a pedal which released the boom causing it to fall. Donahue's claim was based on an allegation of design defect attributable to the failure of the manufacturer to provide a guard that would prevent accidental contact with the boom release pedal. The operator of the crane, however, insisted that he had not touched the pedal and disclaimed any responsibility for the accident. No other mishaps had occurred before or after the accident, and the crane was put back in service without any repairs or modifications.

At the Donahue pretrial conference, the trial judge [1] suggested a settlement in the amount of $600,000. Neither of the parties had submitted any figures to each other before that point.

Canadian convened a claims committee consisting of a state judge, two vice presidents, the claims manager, assistant claims manager, claim superintendent, and the claims examiner in charge of the case.[2] The case summary submitted to the committee contained a verdict range of approximately $1,000,000, a demand of $600,000, and a settlement range of $300,000 to $400,000. The committee decided that the case was one of "no liability," i.e., no offer should be made and the case should be tried. Although he never communicated his decision to Canadian, its counsel, or the

**1.** To avoid confusion, the judge who presided over the Donahue case will be referred to as the "trial judge." The judge whose decision we are now reviewing will be called the "district judge," the "district court," or "the court."

**2.** The record gives little information about the status and makeup of this committee.

trial judge, Donahue's lawyer had concluded that if an offer of $400,000 were made, he would recommend that figure to his client.

About six months before the trial, Puritan's counsel wrote to Canadian, pointing out the dangers of the case, and urged negotiations with Donahue's lawyer. On receiving this letter, Canadian reconvened its claims committee, which held to its previous decision. After that recommendation, the trial lawyer Canadian had retained to defend the Donahue case sent a letter to Northwest's private counsel, advising him of the possibility of an excess verdict. Documentary evidence in the record establishes that Northwest persisted in its belief that the case should be tried and so advised Canadian.

Donahue's lawyer had been informed that Canadian considered the case one of no liability and, based on this statement, submitted no demand for settlement.

In making its findings in the litigation at hand, the district court concluded that the Donahue case had been thoroughly investigated, and at the time of trial the relevant facts were known. The parties realized that the issue would be submitted to the jury and that the injuries were serious. According to the district court, "there were virtually no defenses available" and "there was no alternative theory" to be presented by Northwest. In those circumstances, the district court held that Canadian had an affirmative duty to explore settlement possibilities and that a demand from Donahue was not a prerequisite to liability for bad faith.

The court further concluded that after the Donahue pretrial conference, the rigid stance of "no liability" was "evidence of a demonstration of bad faith," which had been established by "a clear preponderance of the evidence and by evidence that was also clear and convincing."

Puritan, as excess insurer, was found by the court to be "equitably subrogated as to any rights Northwest has against Canadian." In addition the court held that Canadian "as the primary insurer owes a direct duty to the plaintiff Puritan." The court entered judgment for the amount Puritan had expended but denied punitive damages and counsel fees.

On appeal, defendant contends that the district judge erred in applying an improper standard to determine the duty of the primary carrier and in failing to interpret properly the doctrine of equitable subrogation. Plaintiff argues that a primary carrier has an affirmative duty to initiate settlement discussions and that it owes a direct duty to an excess carrier.

The relationship between the primary and excess carrier is an unusual one; each has a separate contract with the insured, but they have none with each other. Conflicts of interest invariably arise when the underlying tort injury is of such severity that a recovery over the limits of the primary policy is possible. In that circumstance, the excess carrier wishes the primary insurer to dispose of the case within its limits and is not unduly impressed with the primary insurer's desire to save some or all of its policy limits by a favorable verdict at trial. Conversely, the primary carrier is unlikely to have such paternalistic feelings as will induce it to concede its limits when there is some chance of obtaining a favorable verdict. In each instance, one carrier is to some extent gambling with the other's money. *See generally*, Lanzone and Ringel, Duties of a Primary Insurer to an Excess Insurer, 61 Neb.L.Rev. 259 (1982).

The obligations of the carriers to the insured are somewhat different. Because it has a duty to defend the insured and on average most claims are within its limits, the primary carrier charges a larger premium for an equivalent amount of coverage. In addition, the primary's policy generally gives it the right to decide when a claim shall be settled or tried.

Because of its less frequent exposure, the excess carrier generally charges lower premiums. Its obligation does not arise until primary limits are exhausted, and to some extent the excess carrier is at a disad-

vantage in dealing with a tight-fisted and overly optimistic primary carrier, which has greater control over settlement. To gain increased leverage, excess insurers frequently resort to use of the "bad faith letter"—an epistle sent to the primary carrier demanding settlement within primary limits and warning that failure to do so will be interpreted as evidence of bad faith.

The insurance industry has long recognized the unsatisfactory nature of the relationship between primary and excess carriers. Attempting to ease some of these tensions, in 1974 the Claim Executive Council of the American Insurance Association, the American Mutual Insurance Alliance, and some unaffiliated insurers proposed and adopted a set of guiding principles to govern relationships between primary and excess carriers. However, very few companies ultimately subscribed to these principles. *See* Magarick, *Excess Liability*, § 14.09 (2d ed. 1982).

As we have pointed out in other cases, the insurance industry has available to it a system of inter-company arbitration where disputes such as the one at hand can be resolved by arbitrators thoroughly experienced in the complexities of insurance policies and practice. *See Insurance Co. of North American v. Continental Casualty Co.*, 575 F.2d 1070 (3d Cir.1978). Despite these alternatives, the industry has been unable to resolve its internal disputes and instead submits them to the vagaries of state law. To no one's surprise, the results have been less than uniform.

The parties concede that the law of Pennsylvania applies but the state appellate courts have not yet faced the legal issue presented here. We must therefore grope our way through the flickering *Erie* light in an effort to predict what Pennsylvania would decide in a case such as this. There are some guideposts.

After the district court entered judgment in this case, we decided *U.S. Fire Ins. Co. v. Royal Ins. Co.*, 759 F.2d 306 (3d Cir. 1985), also a dispute between primary and excess carriers. We concluded that Pennsylvania would apply the doctrine of equitable subrogation. Thus "an excess insurer who has discharged an insured's liability stands in the shoes of the insured and as subrogee may maintain an action for breach of the primary carrier's duty to act in good faith." *Id.* at 309. The theory of a direct duty running from the primary to the excess carrier was rejected. *Id.* at 309 n. 3.

▪ In Pennsylvania, the standard of care owed by a carrier to its insured in handling settlement matters is stated in *Cowden v. Aetna Casualty & Surety Co.*, 389 Pa. 459, 134 A.2d 223 (1957). There, the court held that the insurer could be liable for an amount in excess of limits if its "handling of the claim, including a failure to accept a proffered settlement, was done in such manner as to evidence bad faith." *Id.* at 468, 134 A.2d at 227. The court also determined that "bad faith must be proven by clear and convincing evidence," and that mere "bad judgment" is not actionable. *Id.* at 472, 134 A.2d at 229. "[T]he decision to expose the insured to personal pecuniary loss must be based on a bona fide belief by the insurer, predicated upon all the circumstances of the case, that it has a good possibility of winning the suit." *Id.* at 471, 134 A.2d at 228.

▪ As we held in *United States Fire*, the excess carrier must produce clear and convincing evidence that the primary carrier's "evaluation of the case was less than honest, intelligent and objective" or that it failed to accord the interest of the excess insurer the same faithful consideration it gave to its own. 759 F.2d at 311.

Although the possibility of an "automatic liability" rule (that the primary insurer is liable for an excess verdict whenever it refuses to offer its policy limit toward settlement) was discussed in *Shearer v. Reed*, 286 Pa.Super. 188, 428 A.2d 635 (1981), the Pennsylvania Superior Court continues to adhere to the bad faith standard.[3] *Cf.*

---

**3.** Adoption of an automatic liability rule would

probably lead to the use of no limits policies as

*Crisci v. Security Ins. Co. of New Haven, Conn.,* 66 Cal.2d 425, 426 P.2d 173, 58 Cal.Rptr. 13 (1967).[4]

In a pretrial ruling in this case, the district court decided that a primary carrier has a direct duty to the excess insurer. *Puritan Ins. Co. v. Canadian Universal Ins. Co.,* 586 F.Supp. 84, 88 (E.D.Pa.1984). As noted, we later held to the contrary in *United States Fire.* That is not the end of this case, however. The district court also found that defendant Canadian was guilty of bad faith, which had been proved by clear and convincing evidence. In making its finding, the court noted that Canadian had not made any offer to Donahue. Because Canadian had indicated to Donahue's lawyer that it considered the case one of "no liability," which would have to be tried, the court concluded that the absence of a demand did not relieve Canadian of an affirmative duty to negotiate. The insistence of Northwest, the insured, on trial of the case did not bar the claim of wrongful refusal to settle asserted by Puritan, according to the court.

As we said in *United States Fire,* the excess carrier stands in the shoes of the insured. In this case, Puritan's status as subrogee makes it subject to any defenses that could be raised against Northwest. *See Insurance Co. of North American v. Carnahan,* 446 Pa. 48, 284 A.2d 728 (1971); *Great American Ins. Co. v. United States,* 575 F.2d 1031 (2d Cir.1978); *Williams v. Globe Indem. Co.,* 507 F.2d 837 (8th Cir. 1974); 8B Appleman, *Insurance Law and Practice* § 4941.

There is no dispute that Northwest, which was represented by its own counsel, concurred with Canadian that the personal injury case was one of no liability and should be tried. Northwest was kept fully informed of developments and was consulted about the engineering aspects of the

Donahue theory of liability. Northwest officials wrote that they were unimpressed with the report of Donahue's expert and believed that his theory of design defect was itself flawed.

Despite this uncontradicted evidence, the district court concluded that Northwest's agreement with Canadian's decision before trial would not bar recovery on the theory of wrongful failure to settle. Because the policy gave Canadian the right to determine whether the case would be tried or settled, the court held that Northwest could not be estopped by its own conduct.

■ In these circumstances, however, we believe the Pennsylvania courts would conclude that the insured's consent, and indeed direction, to try the case after being fully informed of the risks involved is an insurmountable barrier to the maintenance of a bad faith claim against the insurer. *See Jackson v. St. Paul-Mercury Ins. Co.,* 339 F.2d 40 (6th Cir.1964). *See also Boston Old Colony Ins. Co. v. Gutierrez,* 386 So.2d 783 (Fla.1980); *Eklund v. Safeco Ins. Co. of America,* 41 Colo.App. 96, 579 P.2d 1185 (1978); *Peterson v. American Family Mut. Ins. Co.,* 280 Minn. 482, 160 N.W.2d 541 (1968).

■ Although the carrier had the contractual right to settle or try the case, its liability for the wrong choice, in the words of the *Cowden* case, must rest on "bad faith, and bad faith alone." 389 Pa. at 471, 134 A.2d at 229. We fail to see how Northwest could successfully prove bad faith in a decision to follow a course which it approved and advocated at the time the decision was made. In considering this issue, the district court may possibly have been influenced by its decision that the primary owes a direct duty to the excess carrier. However, we have rejected that theory. Under equitable subrogation the rights of the excess carrier may not rise above those

is common in Europe. Such a development might also be expected to lead to increased premiums.

**4.** *Rova Farms Resort, Inc. v. Investor's Ins. Co. of America,* 65 N.J. 474, 323 A.2d 495 (1974) contains dictum suggesting that New Jersey would

adopt a version of an automatic liability rule. That the court had adopted such a rule, however, was explicitly denied in a later case. *Fireman's Fund Ins. Co. v. Security Ins. Co. of Hartford,* 72 N.J. 63, 367 A.2d 864 (1976).

of the insured, and thus the insured's conduct becomes a much more significant consideration.

With the increasing frequency of large deductibles and various forms of self-insurance, excess carriers must scrutinize the actions of the insured as well as those of the primary insurer for evidence of bad faith. This record, however, discloses nothing to suggest that Northwest was acting in bad faith toward its excess insurer, Puritan. In any event, we need not address the possibility of such liability because it was not alleged here. *See* Gallagher & German, *Resolution of Settlement Conflicts Among Insured, Primary Insurers and Excess Insurers*, 61 Neb.L. Rev. 285 (1982).

The duty to settle was developed to protect the insured's interest in avoiding excess liability. When an insured—fully aware of such exposure—decides that his interests are better served by going to trial, a finding of bad faith on the part of the carrier is highly unlikely. On the record of this case, we hold that Puritan, as subrogee of Northwest, cannot recover.

■ Furthermore, on this record we find no clear and convincing evidence of bad faith on Canadian's part. As noted earlier, Donahue's theory of liability was that the crane operator's foot slipped and came in contact with the latch on the pedal controlling the boom thus causing the fall. To avoid such a mishap, Donahue contended that a protective guard should have been installed near the latch.

The crane operator had been deposed before trial, however, and he strongly denied that his foot had slipped and touched the latch. If that were believed, then the Donahue theory would collapse because the lack of a guard would not have been the proximate cause of the injury. After having had the opportunity to observe the crane operator at his deposition, Canadian's counsel and the lawyer for an additional defendant agreed that the operator would be a very forceful and unequivocal witness at the trial. No one could contradict his testimony, and the condition of the latch

shortly after the accident supported his version of what had occurred.

Moreover, defense counsel believed that the weak qualifications of Donahue's expert witness and inconsistencies in his reports would provide effective impeachment material. An additional factor aiding the defense was the age of the machine. It had been manufactured by Northwest in 1961 and consequently was approximately 17 years old at the time of the accident. The crane had been owned by at least two concerns over those years. That lengthy time and the change of ownership raised the possibility that the incident had occurred for reasons other than a design defect.

Donahue's attorney testified in the case at hand that he was "the underdog" going into the personal injury trial and that he felt he had less than 50% chance of winning on liability. John P. Pender, the experienced attorney for an additional defendant, felt that "it was a defensible case." Northwest's trial attorney believed that he had a nine-in-ten chance of success on the liability phase of the case.

Thus, all three lawyers involved in the preparation for, and trial of, the Donahue case acknowledged that, despite the severity of the injuries, they felt there was a very real possibility that the defense would be successful. That testimony stands uncontradicted.

All counsel were aware, as is this court, that accurate prediction of a jury's decision is not always possible. Here the record shows that after thorough assessment of the case a competent plaintiff's lawyer planned to recommend a settlement of approximately 40% of what he would expect to receive by verdict if successful on liability. His willingness to make such a proposal is strong evidence that a defense existed.

The situation in this case contrasts sharply with *Cowden* where a previous trial had resulted in an adverse verdict. In that case, the insured had tendered a substantial sum of his own during the second trial, which he proposed to use in addition

to the policy limits to obtain a settlement. Despite those circumstances, the Supreme Court of Pennsylvania held that no bad faith had been proved. That case was a far stronger one for recovery than the present one.

Nor do we agree that on this record Canadian had an affirmative duty to initiate settlement negotiations with Donahue. The same factors that militate against a finding of bad faith in refusing to settle are relevant in this instance as well. An insurance carrier may be required to broach settlement negotiations under some circumstances but this case does not present them.

Traditionally and logically, the impetus for settlement comes from the plaintiff. He is the one seeking recovery and therefore has the burden of stating just what it is that he wants. A feigned lack of interest in settlement by a defendant is a widely recognized negotiating ploy. We see no reason why use of this technique should excuse the plaintiff from stating his demand. The utter uselessness of *ad damnum* clauses in personal injury cases requires that at some stage in the litigation the real amount of the claim be disclosed. Only the plaintiff can supply it.

The district court referred to Pennsylvania Rule of Civil Procedure 238, which provides delay damages for failure to settle, as indicating a policy to encourage defendants to make reasonable offers. In *United States Fire* we found that the rule bears no relevance to the question of an insurer's bad faith in failing to make an offer. Clearly, settlement is a two-way street and is not limited to the defendant's insurance carrier.

In summary, we conclude that Pennsylvania recognizes no direct duty of good

faith between a primary and an excess carrier. An action founded on equitable subrogation will lie, but in the case at hand plaintiff failed to prove its entitlement to reimbursement. Accordingly, the judgment of the district court will be reversed and the case remanded with directions to enter a judgment for defendant.

GIBBONS, Circuit Judge, dissenting:

I believe that the prediction of Pennsylvania law with respect to the liability of a primary to an excess carrier made by the district court in this case is at least as plausible as that made by the majority. I also believe that the court's finding of bad faith is not clearly erroneous. Moreover the majority reads more into our decision in *United States Fire Insurance Co. v. Royal Insurance Co.*, 759 F.2d 306 (3d Cir.1985) than I see there.[1] Thus I would affirm the judgment appealed from.

---

1. Judge Rosenn wrote:
    Fire strongly urges that this court allow a direct cause of action by the excess carrier against the primary "thus obviating the need to struggle with the equitable subrogation theory." Supp. brief, of appellee at 10. Fire has cited no Pennsylvania cases creating such a direct duty and no plausible legal or policy basis for so doing. We decline to do so in the instant case, without further guidance from

the Pennsylvania Supreme Court. *But see Puritan Ins. Co. v. Canadian Universal Ins. Co.,* 586 F.Supp. 84, 88 (E.D.Pa.1984).
759 F.2d at 309 n. 3. As I read *United States Fire Ins. Co. v. Royal Ins. Co., supra,* the panel intended to leave open the question that the district court decided in the instant case, because the panel relied on an equitable estoppel theory.