909 F.2d 228
 CERTAIN UNDERWRITERS OF LLOYD'S AND COMPANIES SUBSCRIBING TO
EXCESS AVIATION LIABILITY INSURANCE POLICY NO.
FL-10959 A & B, Plaintiff-Appellee,
v.
GENERAL ACCIDENT INSURANCE COMPANY OF AMERICA, Defendant-Appellant.
 No. 89-1695.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 7, 1989.
Decided July 31, 1990.
 
 Hugh E. Reynolds, Jr., Thomas L. Davis, Locke, Reynolds, Boyd & Weisell, Indianapolis, Ind., Mark A. Dombroff, Katten, Muchin, Zavis & Dombroff, Washington, D.C., Edward Griffith, Katten, Muchin, Zavis & Dombroff, New York City, for plaintiff-appellee.
 Glenn E. Davis, Sr., Davis, Davis & Langan, Indianapolis, Ind., for defendant-appellant.
 Before BAUER, Chief Judge, and CUMMINGS and CUDAHY, Circuit Judges.
 BAUER, Chief Judge.
 
 
 1
 Plaintiff-Appellee, Certain Underwriters of Lloyds' and Companies Subscribing to Excess Aviation Liability Insurance Policy No. FL-10959 A & B ("Underwriters"), brought suit against defendant-appellant, General Accident Insurance Company of America ("General Accident"), to recover its contribution to the settlement of judgment entered against C.F.E. Air Cargo, Inc. ("CFE") in a personal injury action. Jurisdiction was based upon diversity of citizenship. General Accident provided primary insurance coverage to CFE, an air cargo company operating out of Indianapolis International Airport ("the airport"), and Underwriters provided excess insurance coverage. Underwriters sought to recover that portion of the settlement which was in excess of the primary policy limits on the theory that General Accident wrongfully failed to settle the personal injury action within the primary policy limits. The jury returned a verdict in favor of Underwriters. General Accident appeals, contending that the district court erred by granting partial summary judgment for Underwriters, refusing to direct a verdict for General Accident, and refusing to give General Accident's proposed jury instruction on damages. For the following reasons, we affirm.
 
 I.
 
 2
 In September 1981, General Accident and Underwriters each issued insurance policies to CFE, extending coverage for the period July 1, 1981, to July 1, 1982. General Accident's policy provided primary liability coverage up to the policy limit of $300,000 for CFE's potential liability to third parties arising from CFE's general airport operations. Underwriters' policy provided excess liability coverage of the same risk for amounts in excess of the primary policy limit up to a total limit of $5,000,000. It also provided primary liability coverage of certain risks associated with specific activities of CFE relating to cargo handling, operation of electrical equipment and fueling. Both policies named the owner of the airport, the Indianapolis Airport Authority ("the Authority"), as an additional assured.
 
 
 3
 In January, 1982, Mr. Lee Draper, a pilot employed by Transamerica Airlines, slipped and fell on an ice-covered ramp shortly after he had exited a Boeing jetliner. Mr. Draper fell in an area of the airport that was leased from the Authority by Kenworthy Air Freight Services, Inc. ("Kenworthy") and was adjacent to an area leased from the Authority by CFE. At the time of Mr. Draper's accident, however, Kenworthy had ceased its airport operations and CFE was using Kenworthy's airport area.
 
 
 4
 In 1983, Mr. and Mrs. Draper brought a personal injury action against CFE which was covered under General Accident's primary policy and Underwriters' excess policy. As CFE's primary insurer, General Accident assumed control of CFE's defense and retained David Campbell and Guy Relford of the law firm of Bingham, Summers, Welsh & Spillman ("Bingham Summers") to represent CFE in the Draper lawsuit. Underwriters retained John Martin and Robert Hirsch of the law firm of Bigham, Englar, Jones & Houston ("Bigham Englar") to advise them as to their excess exposure in the lawsuit.
 
 
 5
 In October 1983, Hirsch wrote to General Accident on behalf of Underwriters requesting copies of the Draper pleadings and asking that General Accident keep him apprised of the progress of the litigation. Michael Cook, General Accident's Claims Manager in charge of the Draper case, acknowledged receipt of the letter and informed Hirsch that General Accident had instructed Bingham Summers to send copies of the Draper pleadings to him.
 
 
 6
 In April 1984, Underwriters was served with a third party summons and complaint by the Authority, which had also been sued by the Drapers. The complaint indicated that a new defendant, Kenworthy, had been added to the lawsuit. As Underwriters had not received any information concerning the Draper litigation from Bingham Summers, Hirsch again contacted General Accident's Claims Manager to repeat Underwriters' request to be kept apprised of the case and to receive the pleadings and other relevant documents in the case.
 
 
 7
 A few weeks later, Relford sent Hirsch copies of the requested materials. He also informed Hirsch that the accident had occurred on the property of Kenworthy, which was not an assured of Underwriters. Underwriters thereafter heard nothing further about the litigation for approximately one year.
 
 
 8
 On April 11, 1985, two days after the trial began, Cook called Hirsch to tell him that the Draper case had gone to trial and that the Drapers had demanded approximately $700,000 in settlement. Cook said he would call again the next day. At that time, Cook informed Hirsch that Kenworthy had been dismissed from the lawsuit because at the time of the accident CFE had been in control of Kenworthy's property. He said that the jury had begun deliberations and that the Drapers' latest settlement demand was $450,000. Cook also stated that he believed that the case could be settled for General Accident's policy limits of $300,000. Hirsch demanded that General Accident settle within the primary policy limits.
 
 
 9
 General Accident, however, only authorized Campbell, the attorney representing CFE at trial, to make a settlement offer of $75,000. This the Drapers rejected. The jury thereafter returned a verdict against CFE for $818,820.82. Underwriters learned of the verdict three weeks later through CFE's insurance broker and demanded that General Accident settle the case without contribution from Underwriters because of its failure to tender the primary policy limits to the Drapers.
 
 
 10
 General Accident then offered the Drapers $250,000, which they refused. After being advised by Bingham Summers that there was little basis for appeal, General Accident tendered its policy limits. At this point, Underwriters joined in the settlement negotiations with the Drapers. Eventually, the Drapers agreed to a settlement of $650,000, to which General Accident contributed $318,000 and Underwriters contributed $332,000.
 
 
 11
 Underwriters then brought suit against General Accident to recover its $332,000 contribution to the settlement. The action was premised upon bad faith, negligence and breach of contract. General Accident asserted a number of affirmative defenses, including contributory negligence, comparative fault, incurred risk, laches and estoppel. Those defenses were based upon the allegation that Underwriters should have taken more aggressive action to keep itself informed about the progress of the Draper litigation.
 
 
 12
 The district court granted Underwriters' motion for partial summary judgment to dismiss General Accident's affirmative defenses. 699 F.Supp. 732. The court found that the doctrine of equitable subrogation governed the rights and liabilities between excess and primary insurers under applicable Indiana law. Under this theory, the excess insurer steps into the shoes of the insured and has no greater or lesser rights than the insured. The district court also reasoned that the excess insurer has no greater obligations to the primary insurer than does the insured. Under Indiana law, the insured's obligations are limited to the duty to cooperate in the defense of claims covered under the policy. Because General Accident's affirmative defenses were based on allegations that Underwriters had breached duties more far-reaching than the duty of cooperation, the court granted Underwriter's motion. The court also rejected General Accident's argument that Underwriters provided CFE with primary coverage. (Had Underwriters provided primary coverage, it would have been subject to more extensive duties than mere cooperation in defense of the Draper claim.)
 
 
 13
 Underwriters' claim went to trial before a jury. After the conclusion of Underwriters' case, General Accident moved for a directed verdict. General Accident contended that CFE could not recover against it because CFE had acquiesced in its handling of the Draper case. If CFE could not recover, then Underwriters, whose claim against General Accident arose by way of equitable subrogation to the rights of CFE, also could not recover. The district court denied General Accident's motion and General Accident rested. The jury thereafter returned a verdict in favor of Underwriters for the full amount of the Underwriters' contribution toward the Draper settlement. The district court entered judgment on the verdict and General Accident filed a timely notice of appeal.
 
 II.
 A. Partial Summary Judgment
 
 14
 General Accident's first argument on appeal is that the district court erred by granting Underwriters' motion for partial summary judgment to dismiss General Accident's affirmative defenses. The court based its partial grant upon a finding that Underwriters was an excess insurer of CFE. The court then found that Underwriters, as an excess insurer, did not owe the duties claimed by General Accident. General Accident appeals this first finding, contending that Underwriters was a primary insurer of CFE and therefore had the duty to participate in CFE's defense and keep itself apprised of the Draper litigation. Because it failed to assume those duties, the argument goes, Underwriters now cannot complain about the excess judgment.
 
 
 15
 Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). In support of its motion for partial summary judgment, Underwriters submitted a copy of the CFE policy, a copy of the policy's cover note (a document issued by the insurance broker which reflects the policy's terms and conditions of coverage), and, pursuant to Fed.R.Civ.P. 56(e), the declarations made under oath by Michael Iacovelli, the insurance broker who placed CFE's insurance with Underwriters. The policy, the cover note and Iacovelli declarations unambiguously demonstrate that the Underwriters' policy does not provide primary liability coverage of CFE's liability to third parties arising out of CFE's general airport operations. Although the policy does provide primary liability coverage for certain risks associated with specific activities of CFE relating to cargo handling, operation of electrical equipment, and fueling, the Draper claim did not involve any of those specific activities. General Accident introduced no evidence to support its unfounded claim that Underwriters also provided primary insurance for general liability. Because Underwriters could not be considered a primary insurer for purposes of this litigation, the district court properly dismissed General Accident's affirmative defenses.
 
 B. Directed Verdict
 
 16
 General Accident's second argument on appeal is that the district court should have directed a verdict in its favor at the close of Underwriters' evidence. General Accident contends that because CFE could not have recovered the excess judgment from it based upon bad faith, neither could Underwriters. Although we agree with General Accident's initial contention that under Indiana law the doctrine of equitable subrogation would govern the rights and liabilities between primary and excess insurers, we disagree with its second contention that CFE, and therefore Underwriters, could not recover from it for bad faith or negligence in its handling of the Draper lawsuit.
 
 
 17
 Under Indiana law, an insurer is liable to its insured for a judgment exceeding policy limits when the insurer, who has exclusive control of defending and settling the suit, refuses, in negligence or bad faith, to settle within policy limits. Bennett v. Slater, 154 Ind.App. 67, 289 N.E.2d 144, 146 (1972); Anderson v. St. Paul Mercury Indemnity Co., 340 F.2d 406, 408 (7th Cir.1965). The duty to act with due care and in good faith arises from the conflict of interest between the insured and the insurer when the insured's potential liability exceeds the policy limits. When a claim exceeds policy limits, a rational insured, having purchased protection against liability, would seek to settle the cause of action within policy limits. Typically, however, the insurer has full control over defense of the claim, including the decision to settle. Absent a duty to settle, the insurer would consider only its monetary interests in deciding whether or not to settle, ignoring the risk of an excess verdict which would be borne entirely by the insured. The duty of due care and good faith remedies that situation, forcing the insurer "to view the situation as if there were no policy limits applicable to the claim, and to give equal consideration to the financial exposure of the insured." Continental Casualty Co. v. Reserve Ins. Co., 307 Minn. 5, 238 N.W.2d 862, 864 (1976). See generally, Certain Underwriters of Lloyd's v. General Accident Ins. Co. of America, 699 F.Supp. 732, 736 (S.D.Ind.1988).
 
 
 18
 When the insured purchases excess liability coverage, it protects itself from the possibility of a judgment above the limits of its primary coverage. The excess insurer, instead, faces the hazard that the primary insurer will refuse to settle the case within the primary limits. The primary insurer's duty to act with due care and in good faith does not disappear simply because the insured purchased excess insurance. The insured's premiums for excess insurance are substantially lower than those paid for primary insurance because the probability of reaching the excess coverage is similarly lower; should the primary's duty of good faith evaporate with the purchase of excess coverage, thus increasing the probability of an excess judgment, the insured's excess premiums would correspondingly increase. See Valentine v. Aetna Ins. Co., 564 F.2d 292, 298 (9th Cir.1977). Thus sound policy reasons exist for recognizing an excess insurer's cause of action against a primary insurer for bad faith or negligent refusal to settle within primary limits. However, because no contract exists between a primary insurer and an excess insurer, courts have struggled to develop a theoretical basis for such a cause of action.
 
 
 19
 Three different theories have been articulated in order to allow an excess carrier a cause of action against a primary carrier in the above situation. A majority of courts recognize an action based upon equitable subrogation. See, e.g., Commercial Union Ins. Co. v. Medical Protective Co., 426 Mich. 109, 393 N.W.2d 479 (1986).[1] Equitable subrogation is a legal fiction which provides that a person who pays a third party's debt is substituted or subrogated to all the rights and remedies of that party. Applying this concept to excess insurers, the California Supreme Court has stated:
 
 
 20
 Since the insured would have been able to recover from the primary carrier for a judgment in excess of policy limits caused by the carrier's wrongful refusal to settle, the excess carrier, who discharged the insured's liability as a result of this tort, stands in the shoes of the insured and should be permitted to assert all claims against the primary carrier which the insured himself could have asserted.
 
 
 21
 Commercial Union v. Safeway, 164 Cal.Rptr. at 712, 610 P.2d at 1041.
 
 
 22
 A subrogee, however, acquires no greater or lesser rights than those possessed by the subrogor. Thus the actions of the insured, who no longer possesses a financial stake in the outcome of the litigation against it, can defeat the excess insurer's right of recovery by failing to cooperate with the primary insurer or otherwise acting to supply the primary insurer with a defense to a bad faith action. Because of this danger, a few courts have imposed a direct duty upon the primary insurer to consider the financial interest of the excess insurer so that wrongful conduct on the part of the insured cannot bar the excess's claim. See, e.g., Ranger Ins. Co. v. Home Indemnity Co., 714 F.Supp. 956 (N.D.Ill.1989) (applying Illinois law); Russo v. Rochford, 123 Misc.2d 55, 472 N.Y.S.2d 954 (1984). One court has gone further and recognized a tripartite duty of due care known as "triangular reciprocity" between the insured, the primary insurer and the excess insurer[2] as a basis for the excess insurer's recovery against the primary insurer and insured for wrongful refusal to settle. Transit Casualty Co. v. Spink Corp., 94 Cal.App.3d 124, 156 Cal.Rptr. 360 (1979).[3]
 
 
 23
 Indiana has yet to analyze the respective rights and duties between primary and excess insurers. Finding that Indiana courts look to national trends for guidance on insurance issues of broad application, see, e.g., Bennett v. Slater, 154 Ind.App. 67, 289 N.E.2d 144, the district court determined that Indiana would allow an excess carrier to sue a primary carrier on the basis of equitable subrogation. We agree.
 
 
 24
 General Accident contends that if this is the law, then Underwriters cannot recover, because CFE acquiesced in its handling of the lawsuit and its decision not to settle. General Accident cites Puritan, 775 F.2d 76, for the proposition that an excess insurer cannot recover against a primary insurer when the insured agrees with the primary's decision not to settle the case. Because that agreement took place here, General Accident argues, Underwriters cannot recover as a matter of law under an equitable subrogation theory, and the district court should have directed a verdict in its favor.
 
 
 25
 "In a diversity case, this court must apply the state standard of review to the trial court's decision to grant or deny a directed verdict." Goldman v. Fadell, 844 F.2d 1297, 1301 (7th Cir.1988) (citations omitted). Under Indiana law, an appellate court reviews a trial court's grant of a motion for directed verdict after considering the evidence and all the reasonable inferences to be drawn therefrom in favor of the non-moving party. See Knight v. Baker, 173 Ind.App. 314, 363 N.E.2d 1048, 1050 (1977). A directed verdict should be granted only where there is no evidence or legitimate inferences in favor of the non-movant, or where there is no conflict over the evidence and all possible inferences favor the movant. Id. Although General Accident is correct that, as a matter of law, CFE's consent would bar Underwriters' recovery, whether CFE consented in General Accident's handling of the Draper litigation is a question of fact.
 
 
 26
 The issue of an insured's consent is not necessarily a simple one. In Puritan, 775 F.2d 76, the insurer kept the insured fully informed of case developments and consulted the insured about engineering aspects of the plaintiff's theory of liability. The insured believed that the plaintiff's theory of design defect was flawed and directed the primary insurer to try the case. Under these facts, the insured's consent barred recovery for bad faith by the excess insurer. Puritan, however, was later distinguished by McNally v. Nationwide Ins. Co., 815 F.2d 254 (3rd Cir.1987). There, the court held that the insured's consent was equivocal and would not act as a bar to a subsequent action by an excess insurer. The McNally court further found that the inquiry into whether a defense based upon consent is available to the primary insurer is more than just an inquiry into whether consent was or was not given: because the insurer is an expert and a fiduciary, the court also must determine whether the insurer used its expertise to ascertain the insured's best interests and recommend the appropriate course of action. Id. at 265. In Insurance Company of North America v. Medical Protective Co., 768 F.2d 315 (10th Cir.1985), the court held that the primary insurer's failure to keep its insured fully informed about the course of the litigation and state of settlement negotiations barred use of the consent defense by the insurer. The court noted that the primary insurer failed to inform the insured that trial might result in a verdict in excess of the primary policy limits. It also stated that the insurer must conduct settlement negotiations in good faith regardless of whether the insured eventually will consent to the settlement. Id. at 319.
 
 
 27
 Here, the insured's consent to General Accident's strategy was not unequivocal. CFE certainly did not refuse to settle nor did it direct General Accident to take the case to trial. In fact, CFE was quite worried about the possibility of an excess judgment. David Campbell, CFE's trial counsel, contacted General Accident to voice these concerns. He was advised by Michael Cook that General Accident had a $10,000,000 excess policy which covered the Draper claim. Campbell, in turn, informed CFE's president of this coverage. Cook, however, was mistaken: General Accident did not provide CFE with excess coverage. Under these facts, CFE's actions did not amount to consent and so the district court correctly refused to direct a verdict in General Accident's favor.
 
 C. Jury Instruction
 
 28
 Last, General Accident claims error with respect to the court's instruction to the jury on damages. The court instructed the jury:
 
 
 29
 If you find (1) that General Accident breached its duty of good faith to plaintiffs and (2) that General Accident's breach of its duty proximately caused injuries to plaintiffs, then plaintiffs are entitled to compensation for all injuries proximately caused by General Accident's breach of its duty. In calculating this amount, you may take into consideration the amount of plaintiffs' contribution to the Draper settlement that you believe was proximately caused by General Accident's breach.
 
 
 30
 The jury also was instructed upon the meaning of proximate cause. General Accident wanted the following instruction given:
 
 
 31
 I instruct you, Ladies and Gentlemen, that if you find from the evidence that plaintiffs are entitled to recover, but you further find from the evidence that a settlement would have required a contribution by plaintiffs, any recovery awarded to plaintiffs must be limited to the difference between the amount that would have been contributed to the settlement and the amount ultimately paid by plaintiffs in satisfaction of the judgment.
 
 
 32
 In reviewing a claim of error in the jury instructions, "we must look to the instructions as a whole, in a common sense manner, avoiding fastidiousness, inquiring whether the correct message was conveyed to the jury reasonably well." Wilk v. American Medical Ass'n, 719 F.2d 207, 218 (1983). We will not find reversible error absent some effect on the substantial rights of the parties. General Leaseways, Inc. v. National Truck Leasing Ass'n, 830 F.2d 716, 725 (7th Cir.1987).
 
 
 33
 We believe the court adequately instructed the jury on the issue of damages. Its instruction is much clearer than General Accident's tendered instruction. As its argument in support of error makes clear, General Accident is not so unhappy with the given instruction as with the jury's finding that it proximately caused damages in the amount of $332,000: the amount of Underwriters' contribution to the Draper settlement. There was, however, ample evidence to support the jury's finding that the Draper litigation could have been settled within the primary policy limits. Even General Accident's Claims Manager, Michael Cook, testified that he believed as late as one month prior to trial that the Draper litigation could have been settled for approximately $200,000. We therefore find no error in the instruction nor any problem with the jury's assessment of damages.
 
 III.
 
 34
 General Accident's arguments of error are unpersuasive. As an excess insurer, Underwriters succeeded to the rights of CFE. Because CFE could have recovered against General Accident, so could Underwriters. Furthermore, there is reason to believe that the Drapers would have accepted a settlement within the primary policy limits. The judgment against General Accident is therefore
 
 
 35
 AFFIRMED.
 
 
 
 [1]
 See also Puritan Ins. Co. Canadian Universal, 775 F.2d 76 (3rd Cir.1986) (applying Pennsylvania law); Continental Casualty Co. v. Reserve Ins. Co., 307 Minn. 5, 238 N.W.2d 862 (1976); North River Ins. Co. v. St. Paul Fire & Marine Ins. Co., 600 F.2d 721 (8th Cir.1979) (applying South Dakota law); Ranger Ins. Co. v. Travelers Indemnity Co., 389 So.2d 272 (Fla.App.1980); Centennial Ins. Co. v. Liberty Mutual Ins. Co., 62 Ohio St.2d 221, 404 N.E.2d 759 (1980); Commercial Union Assurance Cos. v. Safeway Stores, 26 Cal.3d 912, 917-18, 164 Cal.Rptr. 709, 610 P.2d 1038 (1980); Portland General Electric Co. v. Pacific Indemnity Co., 579 F.2d 514 (9th Cir.1978) (applying Oregon law)
 
 
 [2]
 There would be no difference between the direct duty theory and the triangular reciprocity theory in those jurisdictions which recognize an insurer's right to sue the insured for breach of the covenant of good faith and fair dealing. Although courts historically have not been receptive to such suits, see, e.g., Commercial Union, 610 P.2d 1038, recent cases seem to recognize that the covenant of good faith and fair dealing is a two-way street. See, e.g., California Casualty General Insurance Co. v. Superior Court, 173 Cal.App.3d 274, 218 Cal.Rptr. 817 (1985)
 
 
 [3]
 For a further discussion of this issue, see Sutterfield, Relationships Between Excess and Primary Insurers: The Excess Judgment Problem, 52 Ins. Counsel J. 638 (1985); Lanzone and Ringel, Duties of a Primary Insurer to an Excess Insurer, 61 Neb.L.Rev. 259 (1981); Gallagher and German, Resolution of Settlement Conflicts Among Insureds, Primary Insurers, and Excess Insurers: Analysis of the Current State of the Law and Suggested Guidelines for the Future, 61 Neb.L.Rev. 284 (1981); Annot., 10 A.L.R. 4th 879, Excess Carrier's Right to Maintain Action Against Primary Liability Insurer for Wrongful Failure to Settle Claim Against Insured (1981)