1997-NMCA-049

940 P.2d 1193

**DESIGN PROFESSIONALS INSURANCE COMPANIES, INC., a California Corporation, Plaintiff–Appellant,**

v.

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY, a Minnesota Corporation, Defendant–Appellee.**

No. 17133.

Court of Appeals of New Mexico.

April 17, 1997.

Certiorari Denied May 29, 1997.

Richard D. Yeomans, Guebert & Yeomans, P.C., Albuquerque, for Appellant.

Mark C. Meiering, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, for Appellee.

### OPINION

APODACA, Judge.

**1.** On the Court's own motion, the original opinion filed March 14, 1997, is withdrawn and the following opinion is substituted in its place.

**2.** Plaintiff Design Professionals Insurance Companies, Inc. (Design Professionals) appeals the trial court's order granting summary judgment to Defendant St. Paul Fire and Marine Insurance Company (St. Paul) and denying Design Professionals' motion for partial summary judgment. Design Professionals had sued St. Paul in the trial court for breach of duty allegedly owed by a primary insurer to an excess insurer. On appeal, Design Professionals argues different theories and issues in support of its contention that the trial court erred in granting St. Paul's motion and denying Design Professionals' motion. Unpersuaded by Design Professionals' arguments, we affirm.

### I. FACTUAL AND PROCEDURAL BACKGROUND

**3.** The City of Albuquerque was performing a certain construction project at the Albuquerque airport. The City entered into a contract with Molzen–Corbin & Associates (Contractor–Insured) to perform engineering, architectural, and planning work at the construction site. As part of the contracted work, Contractor–Insured agreed to be in charge of making a "light-check" of the runway lights each day after the work crews finished, to insure that the runway lights were operational. On one particular occasion, Contractor–Insured made the "light-check" earlier than usual and, as a result, an employee of another contractor was electrocuted. The employee (Decedent) died as a result of the injuries he sustained. Decedent's estate filed suit (Decedent's lawsuit) against various defendants, including Contractor–Insured.

**4.** Contractor–Insured carried insurance with two companies—St. Paul and Design Professionals. Both insurance companies defended Contractor–Insured in Decedent's lawsuit. The insurance policies from St. Paul provided combined coverage up to $1,500,000. The policy from Design Professionals provided coverage up to $1,000,000.

**5.** The insurance companies and Contractor–Insured engaged in settlement negotiations with Decedent's estate. As a result of those negotiations, St. Paul agreed to contribute $400,000, and Design Professionals

agreed to contribute $100,000 toward settlement of Decedent's lawsuit. According to Design Professionals, out of the $100,000 that Design Professionals agreed to contribute toward settlement, Contractor–Insured paid approximately $17,373. Decedent's lawsuit was settled in December 1993.

6. In March 1994, Contractor–Insured filed a bad faith claim against St. Paul, contending that St. Paul had failed to indemnify it for its contribution toward settlement of Decedent's lawsuit. According to the complaint filed by Contractor–Insured, despite repeated demands, St. Paul never assured Contractor–Insured that it would defend and indemnify Contractor–Insured with respect to Decedent's lawsuit. As a result, Contractor–Insured felt compelled to defend itself and requested reimbursement of expenses for that defense from St. Paul. St. Paul settled with Contractor–Insured, paying the costs for defense along with the $17,373 contributed by Contractor–Insured to the settlement of Decedent's lawsuit. As part of the settlement of the bad faith claim, Contractor–Insured signed a release.

7. In April 1995, Design Professionals sued St. Paul to recover the approximately $74,820 it had paid in the settlement of Decedent's lawsuit. Design Professionals alleged that it was only an "excess" insurer and that, until St. Paul's policy limits had been reached, Design Professionals was not obligated to pay any monies toward the settlement with Decedent's estate. St. Paul responded that the release signed by Contractor–Insured in the bad faith suit against St. Paul precluded Design Professionals from bringing a claim against St. Paul. St. Paul also claimed that Design Professionals was not an "excess" insurer. St. Paul filed a motion for summary judgment and Design Professionals filed a motion for partial summary judgment. Following a hearing, the trial court agreed with St. Paul's arguments and evidently was particularly persuaded by the fact that Design Professionals did nothing during the settlement of Decedent's lawsuit to reserve its rights, instead contributing to the settlement without comment, objection, or reservation. The trial court granted St. Paul's motion and denied Design Professionals' motion. This appeal followed.

## II. DISCUSSION

8. Summary judgment is only warranted if there are no genuine issues of material fact that would require trial on the merits. *See Roth v. Thompson*, 113 N.M. 331, 334, 825 P.2d 1241, 1244 (1992). When reviewing a trial court's award of summary judgment, we must view the matters presented in the most favorable aspects they will bear in support of the right to trial on the issues. *Read v. Western Farm Bureau Mut. Ins. Co.*, 90 N.M. 369, 374, 563 P.2d 1162, 1167 (Ct.App. 1977).

### A. Summary Judgment In Favor Of St. Paul

9. The trial court held that there were no issues of fact and that St. Paul was entitled to summary judgment. Although the trial court did not make specific findings or conclusions, such findings and conclusions were not required. *Williams v. Herrera*, 83 N.M. 680, 683–84, 496 P.2d 740, 743–44 (Ct.App. 1972). The trial court adopted St. Paul's argument that the only rights Design Professionals possessed to be able to sue St. Paul were subrogation rights derived from standing in the shoes of the insured, Contractor–Insured. *See, e.g., American Gen. Fire & Cas. Co. v. Progressive Cas. Co.*, 110 N.M. 741, 745 n. 3, 799 P.2d 1113, 1117 n. 3 (1990) (excess insurer steps into insured's shoes and asserts rights derivatively); *Puritan Ins. Co. v. Canadian Universal Ins. Co.*, 775 F.2d 76, 80 (3d Cir.1985) (excess insurer stands in shoes of insured making it subject to any defense raised against insured); *American Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480, 482 (Tex.1992) (majority of states allowing excess insurer to sue primary insurer do so on equitable subrogation grounds). Consequently, because Design Professionals' rights are derivative, the extent of Contractor–Insured's signed release in its bad faith claim would determine whether the effect of the release extinguished any claims Design Professionals may have had against St. Paul.

10. The extent of the release, whether it applied to all claims between St. Paul and Contractor–Insured arising from Decedent's lawsuit or only to the claims arising from the Contractor–Insured's bad faith lawsuit, centers on the words stating that the release applies. "solely with respect to the subject matter of the lawsuit referenced above." St. Paul contends the release was a general release for all claims and the words "lawsuit referenced above" refer to Decedent's lawsuit. Conversely, Design Professionals contends that the release was not a general release of Decedent's lawsuit but that the words in dispute referred only to the bad faith "lawsuit" filed by Contractor–Insured against St. Paul.

■ 11. The question whether an ambiguity or uncertainty exists in the wording of a document or contract is a question of law. *See Reinhart v. Rauscher Pierce Sec. Corp.*, 83 N.M. 194, 197, 490 P.2d 240, 243 (Ct.App. 1971); *see also Hansen v. Ford Motor Co.*, 120 N.M. 203, 206, 900 P.2d 952, 955 (1995); *Mark V., Inc. v. Mellekas*, 114 N.M. 778, 781, 845 P.2d 1232, 1235 (1993). The trial court adopted St. Paul's theory that the words referred to Decedent's lawsuit and essentially held that the release effectively ended all of Design Professionals' subrogation rights. In challenging the trial court's ruling, Design Professionals points to no specific error on the part of the trial court, but merely urges the adoption of its own meaning of the word "lawsuit" in the release. Design Professionals has failed to meet its burden of pointing out the trial court's error. *See Novak v. Dow*, 82 N.M. 30, 33, 474 P.2d 712, 715 (Ct.App.1970).

12. Our review of the record supports the trial court's determination. The relative portion of the release reads as follows:

> In exchange for the payment referenced in paragraph 1, *solely with respect to the subject matter of the lawsuit referenced above,* Molzen–Corbin, its heirs, executors, administrators, successors and assigns, hereby releases and forever discharges St. Paul, its agents, employees, departments, divisions, representatives, successors and assigns, from any and all claims, costs, damages, losses, liabilities, actions, and causes of action of whatsoever nature and description, whether known or unknown, suspected or unsuspected, foreseen or unforeseen, real or imaginary, actual or potential, including but not limited to, claims for breach of duty to defend, breach of duty to indemnify and breach of contract, bad faith refusal to defend and indemnify, violation of § 59 A–16–1 Trade Practices and Fraud Sections of the New Mexico Insurance Code, violation of the New Mexico Unfair Practices Act, intentional and negligent infliction of emotional distress, breach of fiduciary duty, whether arising at law or in equity, under the state law, common law, federal law, or any other law or otherwise. (Emphasis added.)

■ 13. The operative question concerns the breadth of the reference in this paragraph: "solely with respect to the subject matter of the lawsuit referenced above." Design Professionals maintains that this reference to the "lawsuit" is limited to the case between Contractor–Insured and St. Paul. In the release, however, reference to that specific case is limited to a defined term— "Lawsuit" with a capital L. The term "Lawsuit" is used in the release to refer only to the case between Contractor–Insured and St. Paul such as in the sentence "Lawsuit will be dismissed with prejudice and the amount of payments will be held confidential." However, when the release speaks beyond this specific Lawsuit, it uses the generic term "lawsuit," without a capital L. In the prefatory paragraphs of the release, the parties state as follows: "Molzen–Corbin, among others, was named as a defendant in a lawsuit filed in the Second Judicial District, County of Bernalillo, State of New Mexico captioned *Chavez v. Molzen–Corbin, et al.*"

14. Thus, on its face, the parties to the release used the generic term "lawsuit" when referring to the underlying tort litigation filed by Decedent's estate that gave rise to the obligation of the various insurers. St. Paul claims that it is released from all claims by Contractor–Insured, not just with respect to this one particular "Lawsuit," but with respect to everything flowing from the original tort claim. To be sure, that is the natu-

ral inference one would expect of an insurer in St. Paul's position.

15. It is noteworthy as well that the parties to the release state their intentions "to put to rest all further controversy" as well as "to effect a general release of all claims between the parties." There is nothing restrictive in this language. Contractor–Insured gives no indication in the release to which it was a party, and to which Design Professionals was not, that it intended to hold anything back. Clearly, Contractor–Insured was giving St. Paul what it wanted—a complete release in exchange for remuneration.

16. We note as well that Design Professionals was unable to advance any document or other evidence indicating a contrary intent to the release. Design Professionals was not a party to the release and had not put Contractor–Insured on notice of any intention to pursue a future claim against St. Paul. It is therefore no surprise that documents produced during discovery failed to support a theory that Contractor–Insured was intending to limit its release. Simply put, Contractor–Insured had no such incentive, and Design Professionals has been unable to offer anything but speculation to that effect. The language used in the release is as broad as could reasonably be envisioned. Additionally, we are offered no plausible explanation, nor can we see any, why Contractor–Insured would have been discharging St. Paul with respect to only its "Lawsuit" but not with respect to the underlying tort "lawsuit." Even speaking textually, the Lawsuit filed by Contractor–Insured against St. Paul was based on the underlying tort "lawsuit," and the complaint in the "Lawsuit" was permeated with references to the underlying tort "lawsuit." Therefore, the "subject matter of the lawsuit referenced above," even if referring only to the Lawsuit filed by Contractor–Insured against St. Paul, refers as well, in its "subject matter," to the "lawsuit" on which it is based and from which it arose. It would be difficult to separate the two, and unnecessary to do so when the parties themselves have not attempted it.

17. We thus conclude that the trial court could reasonably have been persuaded that the import of the release was clear and unambiguous in its meaning. We are reminded by our Supreme Court in *Mark V* that an ambiguity exists only "[i]f the court determines that the contract is *reasonably* and *fairly* susceptible of different construction." *Id.,* 114 N.M. at 781, 845 P.2d at 1235 (emphasis added). We are not persuaded by any such construction in this case.

■ 18. Design Professionals next claims error in that they were not permitted an opportunity to take the depositions of Contractor–Insured's counsel and others to try ascertaining whether that attorney, the client, or others might have had a more limited purpose in mind in granting this release to St. Paul. Because Design Professionals identifies only Molzen–Corbin's counsel as a target for deposition, our discussion is limited to the refusal to allow such deposition. The trial court believed the deposition was unnecessary and proceeded to grant summary judgment without it. Such discovery matters are left to the sound discretion of the trial court. *DeTevis v. Aragon,* 104 N.M. 793, 797, 727 P.2d 558, 562 (Ct.App. 1986). We will not reverse unless satisfied that there is an abuse of discretion. *Id.* at 797–98, 727 P.2d at 562–63. We are confident there has been no such abuse. To begin with, Design Professionals was permitted the opportunity to examine files and other pertinent documents that might reflect on and be relevant to the intention of the parties to the release. The trial court was not examining the release in a contextual vacuum. Second, the underlying negotiations to the release were subject to a confidentiality agreement. As we noted previously, the clear and unambiguous language of the release destroyed all claims by Contractor–Insured. Design Professionals did not identify to the trial court what claims, if any, might have remained after the release went into effect. The trial court was thus faced with a claim for additional discovery without any reasonable assurance that it would be productive or that it was even necessary to the underlying question. It was therefore reasonable for the trial court to decide that there was no basis for ordering St. Paul to break the confidentiality agreement. In our

view, the trial court did not abuse its discretion in arriving at its decision at this point. We are reminded by our Supreme Court in *Mark V* that "[t]he court *may* consider collateral evidence of the circumstances surrounding the execution of the agreement in determining the language of the agreement is unclear." *Id.*, 114 N.M. at 781, 845 P.2d at 1235 (emphasis added). Having already considered some collateral evidence, there is nothing requiring the court to allow a party the opportunity to attempt to discover all other evidence that might possibly relate to the issue.

19. Even if we assumed, however, that the release signed by Contractor–Insured was limited solely to the bad faith claim and did not extend to Decedent's lawsuit, we hold that Design Professionals' claim against St. Paul would have nevertheless failed. We base such holding on the discussion that follows. The trial court did not base its decision solely on its interpretation of the release. We noted previously that the trial court was persuaded by the fact that Design Professionals did nothing during the settlement of Decedent's lawsuit to reserve its rights, instead contributing to the settlement without comment. We agree with the trial court that Design Professionals should not be permitted to fully participate in settlement negotiations without expressing any objections or reservations, then agree to pay a portion of the settlement amount, only to later claim it should not have been required to contribute on the various theories argued below and now on appeal.

20. Other jurisdictions have had occasion to address similar circumstances involving an insurer that contributed to settlement without reservation, then later denied coverage and sought reimbursement. In *Home Insurance Co. v. Certain Underwriters at Lloyd's London*, 729 F.2d 1132, 1134–35 (7th Cir. 1984), an insurer was estopped from asserting noncoverage where it had not raised the argument before the second insurer's settlement with the victim. The reason is obvious. If the second insurer (St. Paul) had known of the noncoverage argument (from Design Professionals), its settlement strategy with Decedent might have been different. At least St.

Paul could have structured the settlement in a manner to facilitate proof of which policy covered what damages. *See id.* Where, as here, both insurers fully participated in settlement with Contractor–Insured and Decedent's estate, without objection or reservation of rights, either participant should in equity be held to have waived any rights to contribution from the other and should be estopped from recovering any amount from the other insurer. *See Hanover Ins. Co. v. Travelers Ins. Co.*, 355 F.2d 552, 552–53 (2d Cir.1966).

21. We recognize that, in the traditional case of equitable estoppel, New Mexico case law requires some showing of reliance on the part of the other party, in this case, St. Paul, before estoppel is applied against the party making a claim. *See Reinhart*, 83 N.M. at 198, 490 P.2d at 244. We believe that, in applying a rule of equity, such as estoppel, absent evidence to the contrary, reliance should be presumed when two insurers (such as Design Professionals and St. Paul in this appeal) enter into settlement negotiations with their insured and a claimant, and, without objection or reservation, finalize a settlement to the apparent satisfaction of all parties. In instances such as shown by the facts in this appeal, by what stretch of the imagination could it be claimed or argued by anyone that St. Paul would not have relied on Design Professionals' involvement and active participation in the settlement negotiation with their insured and Decedent's estate? We hold that, under such facts, we will presume reliance on the part of St. Paul.

22. One reason that parties settle uncertain claims is to avoid the potential of greater liability. *Hanover Ins. Co.*, 355 F.2d at 552–53. It is obvious that where, as here, each party had agreed to contribute to settlement of a lawsuit, the parties were relying on the promise of payment by the other party when they made their respective decisions to settle. *See Home Ins. Co.*, 729 F.2d at 1134–35. Should there later be a dispute between the insurers involved in settlement, the burden should be on the party seeking reimbursement to show that there was no reliance on its contribution to the settlement. *Cf. Gonzales v. Atnip*, 102 N.M. 194, 195, 692 P.2d

1343, 1344 (Ct.App.1984) (public policy favors settlement of disputed claims and the party that seeks relief from settlement of a lawsuit has the burden of persuasion).

23. Here, Design Professionals said nothing while participating in settlement negotiations with St. Paul, Contractor–Insured, and Decedent's estate. Design Professionals did nothing to preserve any exception or reservation of rights. As we have already noted, it is not reasonable to assume that Contractor–Insured, when executing its release to St. Paul, would have reserved any future claims against St. Paul whether on its own behalf or on behalf of Design Professionals. It could not have done so on Design Professionals' behalf because Design Professionals remained silent. In the face of such silence, and the ample opportunity to put all parties on notice and protect its rights, Design Professionals faces a heavy burden demonstrating that St. Paul did not rely on that silence. Under the facts of this case, it does not appear that Design Professionals could have met this burden even with additional discovery. We are persuaded that the trial court correctly concluded that Design Professionals had adequate opportunity below to alert the parties of its claims and did not do so.

### B. Denial Of Partial Summary Judgment To Design Professionals

24. Design Professionals contends that the trial court erred in denying its motion for partial summary judgment. St. Paul argues that denial of Design Professionals' motion for partial summary judgment was not preserved on appeal because it was not from an appealable order and the issue was not included in the docketing statement. The trial court's denial of Design Professionals' motion for partial summary judgment was contained in the same formal written order, signed by the judge, granting summary judgment in favor of St. Paul. That order was a final order, and therefore, appealable. See Harrison v. ICX, Illinois–California Express, Inc., 98 N.M. 247, 249, 647 P.2d 880, 882 (Ct.App.1982). Once a case is assigned to the non-summary calendar, briefs are not limited to issues in the docketing statement. State v. Salgado, 112 N.M. 537, 538, 817 P.2d 730, 731 (Ct.App.1991).

25. Design Professionals argues that it had no duty to indemnify Contractor–Insured, or, in the alternative, its duty to indemnify was secondary to St. Paul's. Whether Design Professionals had a duty to indemnify or whether it would be considered an excess insurer, any claim it had against St. Paul was subrogated to the rights of Contractor–Insured. As we noted previously, all claims by Contractor–Insured were nullified by the release.

26. Additionally, we have carefully reviewed the whole record. We conclude that there was sufficient support for the trial court's denial of partial summary judgment to Design Professionals. Based on a review of the "plain language" of the policies, it could reasonably be concluded that the policies insured against different risks and were not primary or secondary, merely complementary. The language of the St. Paul policy suggests that it was a general liability policy that excluded professional services. The language of the Design Professionals policy suggested that it covered professional services. A reasonable interpretation of the policies suggests to us that they dovetail, providing mutually exclusive coverage for different risks. In addition, on Design Professionals' alternative theory, there were insufficient facts developed in the record to show what kind of specific insurance risks were triggered as a result of Decedent's accident and therefore what portion of which policy would provide coverage. Under those circumstances, granting partial summary judgment to Design Professionals would have been inappropriate. See National Excess Ins. Co. v. Bingham, 106 N.M. 325, 328, 742 P.2d 537, 540 (Ct.App.1987).

### III. CONCLUSION

27. We affirm the trial court's order granting of summary judgment to St. Paul and denying Design Professionals' partial summary judgment.

28. **IT IS SO ORDERED.**

BOSSON, J., concurs.

WECHSLER, J., specially concurs.

WECHSLER, Judge, specially concurring.

29. I concur in the opinion's analysis of the release issue and affirmance of the trial court. I also agree with the opinion concerning the principles of equitable estoppel and their application to the facts. This case is on appeal, however, from the grant of summary judgment. St. Paul Fire and Marine Insurance Company (St. Paul) did not raise equitable estoppel as a basis for summary judgment; the trial court raised it on its own. The parties did not argue it on appeal. Thus, the summary judgment pleadings did not put Design Professionals in the position of marshaling such evidence and presenting it to the court before trial. While I doubt that Design Professionals Insurance Companies, Inc. (Design Professionals) would have been able to meet its heavy burden to demonstrate that St. Paul did not rely on Design Professionals' silence throughout the settlement negotiations and subsequent litigation, it had not yet been confronted with that burden in this lawsuit.