FIRST STATE INSURANCE COMPANY

v.

UTICA MUTUAL INSURANCE COMPANY.

Civ. A. No. 89–02494–RGS.

United States District Court,
D. Massachusetts.

Dec. 2, 1994.

Robert H. Gaynor, Sloane & Walsh, John F. Kehoe, Kehoe & Crosson, Boston, MA, for First State Ins. Co.

John G. Ryan, Finnegan, Underwood, Coombs, Ryan & Tierney, Eugene G. Coombs, Jr., Kilburn & Goscinak, Boston, MA, for Utica Mut. Ins. Co., Inc.

## MEMORANDUM OF DECISION AND ORDER

STEARNS, District Judge.

This trial came before the court sitting without a jury. The plaintiff, First State Insurance Co. (First State), an excess insurance carrier, seeks to recover an insurance payment that it made on behalf of an insured of the defendant Utica Mutual Insurance Co. (Utica). The Complaint alleges that Utica refusal to respond reasonably to an offer to settle the underlying claim caused First State to be liable for the excess above Utica policy limits. The Complaint is in four counts, alleging breach of contract, negligence, violations of Massachusetts General Laws Chapters 93A and 176D, and breach of

the duty of good faith. Jurisdiction is claimed under 28 U.S.C. § 1332.

## FINDINGS OF FACT

From the credible testimony and exhibits, I find the following material facts.

1. The plaintiff, First State Insurance Company, is an excess insurance carrier organized under the laws of Delaware with a principal place of business in Boston, Massachusetts.

2. The defendant, Utica Mutual Insurance Company, is a primary insurer organized under the laws of New York with a principal place of business in Utica, New York.

3. In 1983, Utica's insured, the Fantoni Company (Fantoni), was the general contractor on a project to enlarge a roadway and construct a bridge across the Sudbury River in Framingham, Massachusetts. The construction site was surrounded by a residential neighborhood, a playground, and an elementary school. Although the contract included some money for security fencing, Fantoni, after consulting with a state engineer, decided to fence only its equipment yard. The construction site was left unguarded at night and on weekends.

4. On Sunday, March 27, 1983, Christopher Joyce, a five year old child, wandered from his nearby home into an unfenced area of the construction site. Christopher attempted to traverse a 16' staging plank to a partially constructed support pylon in the middle of the Sudbury River. The plank had apparently been emplaced by teenage vandals. Christopher slipped into the river and drowned. His body was recovered on April 17, 1983, after an intensive search.

5. On November 15, 1983, Christopher's parents, Thomas and Ellen Joyce, brought a wrongful death action against Fantoni in Middlesex Superior Court. The Joyces were represented by David Barber, a partner in the law firm of Mardirosian & Barber. The case proceeded slowly, and by 1988, Barber had delegated the day-to-day handling of the Joyces' claims to an associate, Dean Carnahan. Carnahan in turn had assigned a contract associate, Robert Eberle, to begin preparing the case for trial. Eberle had worked as a paralegal in the Mardirosian firm while seeking admission to the Massachusetts bar. Eberle had practiced law for seven years in Colorado before moving to Massachusetts. He had no prior experience with wrongful death actions. At the time Eberle was assigned to the Joyce case, formal discovery was still in its preliminary stages. Eberle met several times with the Joyces on case-related matters. Despite his personal involvement with the Joyces, Eberle knew that Barber was ultimately responsible for the litigation.

6. At the time of Christopher's death, Fantoni was insured to a limit of $500,000 under a primary general liability policy issued by Utica. Fantoni had excess liability coverage under a policy issued by First State in the amount of $15,000,000. Fantoni had obtained the policies through separate and independent brokers.

7. As the primary carrier, Utica undertook to provide Fantoni with a defense. For this purpose, Utica retained Leo F. Roche, Jr., of the law firm of Roche & Heifitz. Leo Roche delegated responsibility for pretrial matters to his daughter, Therese Roche, an associate in the firm.

8. Immediately after the accident, Utica hired Norfield Associates, an insurance adjuster, to investigate the circumstances of Christopher's death. Norfield submitted a detailed report to Utica on April 7, 1983, and supplementary reports on April 28, 1983, and October 24, 1983. Norfield's initial report included interviews with the resident Massachusetts state engineer and three Fantoni employees. All of the witnesses acknowledged ongoing problems with vandalism at the site, including prior instances in which teenagers had used loose planking to gain access to the support pylon. The state engineer, Charles Mistretta, described the vandalism "as the worst he ha[d] ever seen in 15 years of performing this type of work." One of the employees, Gilbert Berkley, a vice-president of Fantoni, acknowledged that the company had rejected fencing of the site as impractical.

9. On December 5, 1983, Fantoni's surplus lines broker, Martin Ginden Insurance Agency, notified First State of the Joyce lawsuit.[1] First State recognized that the claim involved a potentially serious loss. On January 20, 1984, and again on March 13, 1984, a First State claims examiner wrote to Utica requesting background information.

10. On April 11, 1984, Gilbert Pickett, a Utica regional claims representative, wrote to First State offering to make the "very voluminous" Joyce file available for First State's review. Pickett's letter briefly recounted the facts of the accident and the posture of the litigation. Pickett totaled the plaintiffs' demand at $2,500,000. He concluded with the observation that the case, as a type, was "very difficult to value," but that Utica had set aside a reserve of $50,000 "at this time."

11. Internally, Utica's thoughts about the case were more troubled than Pickett's letter might have suggested. On December 14, 1983, Roche & Heifitz, after a review of the file, warned Utica that the case presented serious issues of liability. Mistakenly believing that Christopher was ten years old at the time of his death, Richard Heifitz estimated the value of the case at around $100,000.[2] On February 1, 1984, Therese Roche informed Utica that she had been told by Dean Carnahan that the plaintiffs were seeking "well over" $100,000 in damages. In a February 6, 1984 memorandum, William Krause, a Utica home office senior claims manager, reflected that the lack of fencing and the failure to post warnings or erect barricades would make it difficult to mount an effective defense on Fantoni's behalf.

12. Despite Utica's invitation, First State did not undertake a review of the Joyce file. On May 16, 1985, First State closed its claims file on the Joyce case.

13. Utica and First State had no further communication concerning the Joyce case until September of 1988.

14. On October 29, 1984, Harold Lovering, a Utica regional claims manager, recommended to Krause that the reserve on the Joyce case be increased to $100,000. In response to a request from Krause for "something more concrete," Lovering replied that he was "not comfortable" with the $50,000 that had been incurred in light of the successful track record of the Joyces' attorneys. On October 18, 1985, Utica raised the reserve to $150,000 (where it remained until the trial began on February 6, 1989).

15. On June 2, 1986, Richard Heifitz wrote to Gilbert Pickett stating that he "hoped" that the case could be settled for "something under $80,000 to $100,000." Heifitz held out the possibility that the Commonwealth of Massachusetts (whose engineer had ratified safety measures at the site) might be persuaded to contribute. Heifitz warned that if the case were to go to trial "a jury could find liability based on not only sympathy but [also on the argument] that we should have had security at the construction site." With respect to the Commonwealth's exposure, Heifitz opined that "[w]e do have a very strong liability argument and that should be used to our advantage in settlement."

16. On October 29, 1986, Krause suggested to Pickett that negotiations begin with the Joyces' lawyers. On March 20, 1987, Pickett responded with a memo informing Krause that plaintiffs' counsel (presumably Carnahan) had suggested that the "full" value of the case was in the range of $200,000–$250,000. (Pickett acknowledged that Carnahan had refused to put forward a formal demand). Pickett stated that he had told Carnahan that he would look into the possibility of a $100,000 settlement package. Pickett alluded to the sympathy factor inherent in

---

**1.** "Typically, the insured contracts independently with both the primary and excess carriers and often it is only through disclosure by the insured after a loss that the primary carrier knows of the excess carrier." P. Butler & R. Potter, "The Primary Carrier Caught in the Middle with Bad Faith Exposure to Its Insureds, Excess Carriers and Reinsurers," 24 Tort & Ins.L.J. 118, 123 (1988).

**2.** Christopher's age would have been a significant factor in evaluating any potential defense of comparative negligence. See Perlin, *Proof of Cases in Massachusetts*, § 25:23 (1992).

the death of a five year old child, and held out the prospect that the Commonwealth might yet agree to contribute to a settlement. On March 23, 1987. Krause recommended granting Pickett authority to make a provisional offer of $75,000 pending clarification of the Commonwealth's willingness to contribute. In a handwritten reply, an unidentified supervisor expressed displeasure at the fact that Pickett had mentioned the figure of $100,000 and recommended instead packaging $40,000 with a similar contribution from the Commonwealth. The supervisor also demanded "inflexibility" in future dealings with the Joyces' lawyers.

17. On September 5, 1987, Therese Roche informed Utica that the Commonwealth was unreceptive to contribution and had threatened to bring a motion to have itself dismissed as a party to the lawsuit. (Roche had warned Utica on April 9, 1987, that the contract was "quite clear" as to the Commonwealth's right to indemnification).[3] Roche recommended going it alone in an attempt to settle the claims.

18. On January 21, 1988, Therese Roche informed Utica that she was having great difficulty getting anyone at Mardirosian & Barber to talk settlement. On March 21, 1988, Roche reported to Utica that Dean Carnahan was being "very uncooperative" about making a demand or taking a position on a separate settlement with Fantoni. Roche stated that she intended to ask the Superior Court to convene a conciliation conference.

19. The conference was scheduled for April 12, 1988. Robert Eberle attended for the plaintiffs. Therese Roche attended for the defendant. Given the absence of an attorney for the Commonwealth (which had not been given notice), the conference was post-poned. Eberle and Roche, however, met informally in the courthouse cafeteria. Eberle told Roche that the case had the potential of "significant liability" and that Utica should consider settling before the acceleration of discovery hardened the plaintiffs' position. At some point during the conversation the figure of $200,000 was mentioned, most probably by Eberle.[4] Roche interpreted that figure as a demand and conveyed it as such in an April 14, 1988 memorandum to Utica with the observation that the amount "does not seem too far out of line."

20. While I find that the figure of $200,000 was more likely than not mentioned by Eberle, I do not believe that Eberle intended the figure to be taken as a demand. I make this finding for the following reasons. Eberle was inexperienced in Massachusetts practice (he had been admitted to the Massachusetts bar only two months earlier) and a very junior employee at Mardirosian & Barber. I credit Eberle's testimony that he was sensitive to the fact that the Joyce case was David Barber's responsibility and that a demand could only have been made with Barber's express authorization. Eberle was emphatic in his testimony that Barber had not given him authority to make a demand on Utica. Eberle's testimony was corroborated by Barber, whom I perceive to have no interest in the outcome of this dispute. Finally, I credit Eberle's testimony that his personal practice, and that of the firm, was to convey all formal demands in writing. Eberle testified that he personally would have recommended settling the case for $250,000 had a firm offer been made in the spring of 1988. Barber, on the other hand, while not ruling out the possibility that he might have recommended such a settlement to the Joyces, testified that he felt that the case was worth much more.[5]

3. Fantoni's contract with the Commonwealth contained an indemnification agreement holding the Commonwealth harmless from any liability "arising out of or in consequence of the acts of the contractor." See *Shea v. Bay State Gas Co.,* 383 Mass. 218, 224–225, 418 N.E.2d 597 (1981).

4. Eberle testified that he had no memory one way or the other of having discussed specific figures with Roche.

5. On August 2, 1988, Therese Roche, in a memorandum to Anthony LaMarca, a Utica claims representative, reported that a status conference on the case had been held on May 17, 1988, attended by Richard Heifitz on behalf of Fantoni, Robert Eberle for the Joyces, and an attorney for the Commonwealth. Roche stated that "[e]vidently at that time, the demand was $200,000 and apparently the Commonwealth feels no responsibility in this matter." Neither Roche nor

21. On August 17, 1988, Eberle wrote to Therese Roche presenting a formal demand of $1,000,000. Both Eberle and Barber (who had approved the letter) believed that this figure represented the combined value of the Utica and First State policies. A similar demand letter was sent by Eberle on September 21, 1988, to First State.

22. On August 25, 1988, Therese Roche recommended in a "final" report to LaMarca that a settlement authority of up to $200,000 be explored. Roche pointed out that even if Utica were to successfully hold the Commonwealth to contribution, Utica would be "in it alone" for any excess over $100,000.[6] With a trial date approaching (then October 12, 1988), Roche warned that "it is almost impossible to defend in a death case of a child" and that her estimate of the chances of a successful defense ranged from 0 to 25 percent. On August 30, 1988, LaMarca responded sympathetically to Roche in a letter that was copied to Walter Trzcinski, a senior claims manager in Utica's home office. On September 10, 1988, Trzcinski sent an angry reply demanding to know whether LaMarca had given Roche a $100,000 authority and if so with whose permission. On September 14, 1988, LaMarca assured Trzcinski that no such authority had been given.

23. On September 2, 1988, Eberle mailed Therese Roche a copy of a decision upholding a $3,000,000 jury verdict in a Middlesex County case involving the wrongful death of a fifteen year old girl.[7] On September 14, 1988, Eberle renewed the $1,000,000 demand in a letter to Roche that was copied to both Utica and First State.

24. On September 15, 1988, Roche wrote to Utica that she "strongly [felt]" that an offer of $200,000 "should be made as soon as possible." Roche warned Utica that "[t]his is a case that clearly shows that there is always a possibility of having a verdict come down far in excess of defendant counsel's predic-

tion." On September 21, 1988, LaMarca pressed Trzcinski for authority to offer a structured settlement "in the vicinity of $150,000." LaMarca did not receive a reply.

25. On September 22, 1988, Roche reminded LaMarca that the plaintiffs' demand letter had asked for a response by September 30, 1988. "I do not think that this is unreasonable," Roche wrote. "We will not be held in high regard by the Judge if we have not made a reasonably substantial offer by then." Roche concluded by stating that "I feel we must make an offer of $200,000." Roche admitted, however, that she had "no indication of any figure from the Plaintiff that is less than the $1,000,000.00 demand."

26. An unsigned Utica internal office memorandum dated October 3, 1988 (the handwriting appears to be Lovering's), noted that the home office (Walter Trzcinski) had been asked for $100,000 authority to settle the case. The next day, October 4, 1988, Lovering wrote that the authority had been granted but that he had "advised [Trzcinski] we wouldn't extend full authority to our [attorneys] unless it was to our benefit." Later that day, Roche was given authority to offer $75,000.[8] Lovering noted that "[w]e know [plaintiff] won't consider [the offer]. We'll probably have to start trial when called and see how things go. *Tough tough* exposure here."

27. On September 23, 1988, Eberle wrote to Roche stating that he had been informed by First State that the excess policy in fact had limits of $15,000,000, and not $500,000, as Mardirosian & Barber had been led to believe. On September 30, 1988, the Joyces escalated their demand to $2,500,000.

28. On September 29, 1988, LaMarca called Ralph Petrosino, a First State adjuster, inviting Petrosino to review Utica's file on the Joyce claim. Petrosino did so a few days later.[9] The file contained the Norfield Asso-

---

Heifitz testified at trial. Eberle was not asked about the May 17th conference.

**6.** See G.L. c. 258, § 2.

**7.** See *MacCuish v. Volkswagenwerk A.G.*, 22 Mass.App.Ct. 380, 494 N.E.2d 390 (1986).

**8.** Roche apparently never transmitted the $75,-000 offer to plaintiffs' counsel.

**9.** The exact date is in dispute, but it is clear from the context of Petrosino's October 6, 1988 letter to Utica and from the secretary's inscription on his October 19, 1988, memorandum that the

ciates reports and some miscellaneous documents, but none of the internal correspondence among Utica's claims examiners and attorneys. Based on his review of Utica's file, Petrosino reported to First State on October 19, 1988, that "[l]iability is questionable to probable.... The insured was doing construction near an elementary school. The insured should have been aware that children, would trespass onto the construction site. They should have taken steps to prevent any type of trespass. They failed to erect any type of fence to keep children away from this dangerous condition. It would seem, by leaving the planks where they were readily accessible is negligence on the insured's part." Petrosino stated that his research had unearthed verdicts in child death cases ranging from $150,000 to $3,000,000. He estimated the exposure in the Joyce case to be from $500,000 to $1,000,000. Petrosino recommended that First State open a $1,000,000 reserve. In doing so, he specifically rejected LaMarca's opinion that the value of the case did not exceed $50,000. In Petrosino's judgment, there was no possibility of obtaining a defendant's verdict, although he had doubts about the Joyces' receptivity to the emotional trauma of a trial.

29. On October 6, 1988, Petrosino wrote to Utica stating that "this is a case of liability against the insured." He also observed that it "would appear" that the case could be settled within the $500,000 Utica policy limit. "Therefore, First State Insurance Company is demanding that you settle this claim within your policy limits."

30. On October 12, 1988, Therese Roche filed a second "final" report with Utica. She noted that the plaintiff's new trial attorney, Mildred Elias (retained by Mardirosian & Barber), "is very competent and very aggressive. She now makes it much more feasible for the Plaintiffs to prove their case and increase their damages." Roche estimated the probable verdict (with interest) in the vicinity of $850,000.

31. The Joyce trial was rescheduled for February 6, 1989. First State was by now deeply involved. On January 27, 1989, Robert Martin, Petrosino's successor, wrote to LaMarca stating that he had been told by Therese Roche that the outstanding demand was for $1,000,000. (Martin attributed the figure to Eberle). Martin insisted "in view of the potential," that Utica either enter into serious negotiations or tender its policy to First State. Martin warned that "[i]t is our opinion that the loss has jury verdict exposure in excess of your underlying limits and that your past offer of $40,[000] to plaintiff attorney leaves him no alternative but to try the case. Should there be a jury verdict in excess of your underlying policy and First State is required to pay we will look to Utica for full reimbursement for failure to negotiate." In an internal memorandum written the same day, Martin explained that his threat was intended to intimidate Utica into tendering the policy in the hopes that First State could structure a $750,000 settlement. Utica did not immediately respond to First State's ultimatum, although LaMarca warned his home office that "we should get some serious money offered here and post incurreds substantially close to our policy exposure."

32. On January 30, 1989, Martin wrote to Utica referencing a conversation that he had just had with Therese Roche in which she had informed him of Eberle's April, 1988, "demand" of $200,000. (Martin mistakenly attributed the figure to Mildred Elias). According to Martin, Roche had said that the demand had been withdrawn after Utica responded with an offer of only $30,000.[10] Martin repeated his warning that "[s]hould there be an adverse and excess finding that impacts First State's policy limit, First State will look to Utica for full reimbursement for its failure to negotiate in good faith." On or about January 30, 1989, First State hired John Kehoe, an experienced insurance defense attorney, to monitor the trial and conduct settlement negotiations. Kehoe as-

review of the file occurred on or before October 5, 1988.

10. Nothing in the record other than this hearsay statement indicates that Mardirosian & Barber

had ever formally withdrawn any demand other than the August 13, 1988 offer to settle the case for $1,000,000. See # 34, infra.

sessed the case as a "liability problem," particularly given Christopher's "angelic appearance."

33. On January 30, 1989, LaMarca wrote to Walter Trzcinski, warning that the case would not settle for the $100,000 authorized and that plaintiff's attorney was targeting the entire Utica policy and $2,000,000 of First State's excess coverage.

34. On February 1, 1989, Mardirosian & Barber, on behalf of the Joyces, presented First State with a written demand of $15,-000,000. The firm stated that its earlier demands had been premised on the mistaken assumption that the combined policy limits totaled only $1,000,000.

35. On February 3, 1989, LaMarca recommended that Utica make an offer of $300,-000 so "as not to be placed in a bad faith situation." On February 7, 1989, he repeated the recommendation to Utica's home office. "We should be offering our top dollar before trial as not to be placed in a bad faith situation. Our $100,000—authority will not settle the case and [plaintiffs' attorney] is targeting in on our full policy and [$]2 [million] of excess carrier."

36. A pretrial conference was held with Superior Court Justice Katherine Izzo on February 6, 1989. Justice Izzo allowed a motion by the Joyces to amend their complaint to add strict liability and punitive damages claims.

37. Following the conference, Therese Roche reported in a lengthy memorandum to Utica that the situation was "serious." Roche predicted that the Joyces, who had been recently deposed, would prove to be very sympathetic witnesses. Roche noted that since the case had been filed in 1983, "jury verdicts returned in cases involving the deaths of young children have increased dramatically." She also noted that Justice Izzo seemed "extremely displeased" by the failure of Utica and First State to "settle or at least make a substantial offer," and that First State's bad faith claim against Utica "would

be considerably weakened if there is a reasonable offer made." On the afternoon of February 6, 1989, Leo Roche, who was conducting Fantoni's defense, offered the Joyces the full $500,000 Utica policy to settle the case. The offer was rejected. Utica then tendered its policy to First State.

38. On February 7, 1989, LaMarca, on behalf of Utica, wrote to Fantoni stating that the primary policy did not cover punitive damages and that any punitive award "will be your personal responsibility."[11] On February 8, 1989, First State sent Fantoni a more qualified letter disclaiming coverage of any punitive damages award.

39. On February 8, 1989, Leo Roche wrote to First State on behalf of Fantoni demanding that First State settle the Joyce claim to protect Fantoni "against any verdict that would include punitive damages or damages for willful or wanton misconduct.... Otherwise, we shall hold First State responsible on a bad faith claim for failure to settle."[12]

40. Trial began on February 7, 1989. On February 8, 1989, the Joyces rejected Kehoe's settlement offer of $750,000 and countered with a demand of $2,200,000. Thereafter the Joyces rejected offers of $1,000,000 and $1,100,000.

41. On February 13, 1989, having heard testimony from two of Christopher's playmates and his teacher (she was permitted to testify that Christopher was an "exceptional child"), and taking note of Mrs. Joyce's "moving, dignified and bereaved" appearance, Kehoe recommended that First State be prepared to offer up to $1,500,000. The case was settled on the fifth day of the trial for $1,250,000 after Justice Izzo spoke privately (at counsels' request) with the Joyces.

## CONCLUSIONS OF FACT AND RULINGS OF LAW

Whether, and in what circumstances, a primary insurer owes a duty to an excess insur-

---

**11.** On February 9, 1989, Trzcinski in a fax to First State repudiated LaMarca's letter.

**12.** First State claims that this letter, threatening a Chapter 93A claim, pressured it into settling

with the Joyces. I find no evidence to suggest that Kehoe, who negotiated the settlement for First State, was influenced by, or even aware of, Leo Roche's letter.

er to act reasonably in settling a case is a matter of debate. Keeton and Widiss, in their treatise on insurance law, take the view that the primary insurer should be held responsible for an improper failure to settle. "The position of an excess insurer is analogous to that of the insured. The right of the excess insurer might be supported either on the theory that it is subrogated to the right of the insured against the primary carrier or on the theory that the relationship between the insurers gives rise to a duty." R. Keeton & A. Widiss, *Insurance Law* (1988), § 7.8(e)(2).

■ In the prevailing view, a primary insurer owes no direct duty of care to an excess insurer to refrain from bad faith refusal to settle a claim.[13] Whether a direct duty might exist under Massachusetts law was left undecided in *Hartford Casualty Insurance Co. v. New Hampshire Insurance Co.*, 417 Mass. 115, 124–125, 628 N.E.2d 14 (1994). In *Hartford Casualty,* the Supreme Judicial Court suggested that the theory of a direct duty might be redundant of the more accepted doctrine of equitable subrogation.[14] "The general rule is that an excess insurer has a claim based on equitable subrogation but no right to a direct action against the primary insurer." *Id.* at 124 n. 7, 628 N.E.2d 14. The rights of an excess carrier against a

primary insurer, in other words, are derivative of, and no greater than, the rights of the insured. Translated into the context of this case, Utica's duty of care to First State was a function of, and commensurate with, its duty to Fantoni, its insured. *Id.* at 116, 628 N.E.2d 14. See *Puritan Ins. Co. v. Canadian Universal Ins. Co., Ltd.*, 775 F.2d 76, 80–81 (3d Cir.1985).[15]

■ As to Fantoni, Utica's duty with regard to the negotiation of a settlement of the Joyce case was at all times to act reasonably and in good faith. *Abrams v. Factory Mut. Liab. Ins. Co.*, 298 Mass. 141, 145, 10 N.E.2d 82 (1937). Why the law imposes this duty is easy enough to explain. Any judgment in excess of Fantoni's policy limit of $500,000 was in the first instance Fantoni's loss to bear.[16] This is where the doctrine of equitable subrogation kicks in. As First State fairly summarizes the doctrine's bite, "[i]f a primary carrier would be obliged to settle a case within its policy limits ... to protect its insured who does not have excess coverage, an excess carrier facing the same claim is entitled to exactly the same protection." Memorandum of July 1, 1994, at p. 10.

"Good faith requires that any settlement decision be made without regard to the policy limits and that the insurer 'exercise common prudence to discover the facts as to liability

---

13. Because of the lack of privity between Utica and First State, any duty owed by Utica arises in a tort rather than a contractual context.

14. "The origin and nature of the doctrine of subrogation lies in equity, and the principles of that jurisprudence govern its application." *Brown v. Leighton*, 385 Mass. 757, 760, 434 N.E.2d 176 (1982).

15. Despite Justice Wilkins' suggestion in *Hartford Casualty* that a theory of direct duty is redundant of the doctrine of equitable subrogation, it has from the excess carrier's point of view the considerable advantage of relieving it from defenses arising out of the insured's conduct. See *Puritan Ins. Co. v. Canadian Universal Ins. Co., Ltd., supra,* 775 F.2d at 80–81 (excess carrier's bad faith claim defeated by insured's agreement and direction to take the case to trial). It is this realization that has led to a strenuous effort on the part of excess carriers to impose a direct duty of good faith on primary insurers. P. Butler & R. Potter, *supra,* 24 Tort & Ins. L.J. at 123–124. Justice McHugh's opinion in *Chicago Insurance Co. v. Birmingham Fire Insurance Co. of Pennsylvania,* Massachusetts Superior Court Civ-

il Action No. 85–7515 (May 6, 1991), on which First State relies for its contention that Massachusetts recognizes a direct duty of good faith owed by a primary insurer to an excess carrier, was written without the benefit of *Hartford Casualty.*

16. Driving the duty even harder was the prospect that Fantoni, if the case did not settle, might be faced with an award of punitive damages, coverage for which First State, at least provisionally, disclaimed any responsibility. Ralph Fantoni, a co-principal of Fantoni Company, testified that he believed that his company had a defense to the Joyces' claims and that consequently he had never prevailed upon Utica to settle. Because it has not been shown that Fantoni was in a position to judge his company's best interest in this regard, or was ever consulted in the matter by Utica in any meaningful sense, I have given no weight to his testimony. Compare *Puritan Ins. Co. v. Canadian Universal Ins. Co., Ltd., supra* (sophisticated insured advised by its own attorneys pressed the case to trial).

and damages upon which an intelligent decision may be based.'" *Hartford Casualty, supra* at 119, 628 N.E.2d 14, quoting *Murach v. Massachusetts Bonding & Ins. Co.,* 339 Mass. 184, 187, 158 N.E.2d 338 (1959). The test, in other words, is one of ordinary negligence. It requires that the excess insurer "prove that the plaintiff in the underlying action would have settled the claim within the policy limits and that, assuming the insurer's unlimited exposure (that is, viewing the question from the point of view of the insured) no reasonable insurer would have refused the settlement offer or would have refused to respond to the offer." *Hartford Casualty, supra* at 121, 628 N.E.2d 14.[17] Moreover, "[i]t is conceivable that, on an objective standard of reasonableness, an insurer would have been warranted in not settling a case but that the insurer's decision was, in fact, motivated by subjective bad faith. In such a case, a charge on negligence would not obviate the need for a subjective bad faith jury instruction." *Id.* at 123, 628 N.E.2d 14. In other words, as First State accurately summarizes in its Memorandum of Law, "an excess carrier may recover against a primary if the excess can show that it was harmed by the primary's subjective bad faith ... even in circumstances where the primary can show that its refusal to settle was reasonable." Memorandum of July 1, 1994, at p. 10.

In assessing whether Utica was negligent (or acted in bad faith) in its handling of the Joyce claim, a number of factors are to be considered, although no one of them is dispositive. They include the diligence of Utica's investigation of the Joyce claim, the reasonableness of its assessment of Fantoni's liability and possible defenses, the reasonableness of Utica's reliance (or failure to rely) on the advice of its counsel, whether a firm settlement demand within the primary limits was rejected, whether Utica kept Fantoni (and First State) apprised of significant developments in the case and particularly of any settlement opportunities, whether the possibility of settlement was fairly and sufficiently explored,[18] and whether any decision to resist settlement was motivated by Utica's self-interest rather than the interests of the insured.

When the history of Utica's involvement with the Joyce claim is considered as a contextual whole, rather than parsed into bits

---

17. First State has suggested several alternative theories giving rise to a duty owed to it by Utica. The first, that First State was a third party beneficiary of Utica's policy, is untenable. To maintain an action as a third party beneficiary, First State would have to show that it was the *intended* beneficiary of the insurance contract between Utica and Fantoni, which it has not, and cannot do. See *Spinner v. Nutt,* 417 Mass. 549, 555, 631 N.E.2d 542 (1994); *Rae v. Air–Speed, Inc.,* 386 Mass. 187, 195, 435 N.E.2d 628 (1982). First State's second argument, that Utica owed it a fiduciary duty, has no support in Massachusetts law and very little elsewhere. Cf. *Hartford Accident & Indemnity Co. v. Michigan Mut. Ins. Co.,* 93 A.D.2d 337, 462 N.Y.S.2d 175, *aff'd,* 61 N.Y.2d 569, 475 N.Y.S.2d 267, 463 N.E.2d 608 (1983). Compare P. Butler & R. Potter, *supra,* 24 Tort & Ins.L.J. at 124–125 ("Subsequent to *Hartford Accident v. Michigan Mutual,* however, courts have begun to recognize the important distinction between a subrogated right and a direct duty and have declined to recognize a direct duty."). Finally, First State argues that the so-called "Guiding Principles," a 1974 industry compact drafted by the American Insurance Association and the Alliance of American Insurers and subscribed to by Utica and First State, create a duty owed directly to First State by Utica. The principles are (as their title suggests) a voluntary code of behavior. "The principles require prompt investigation of claims, notice to excess insurers of settlement negotiations and demands, and consultation with excess insurers about settlement and defense strategy.... [T]hey also forbid formal demands from excess insurers that primary insurers settle a claim within the primary policy limits." K. Syverud, "The Duty to Settle," 76 Va.L.Rev. 1113, 1206–1207 (1990). The principles are normative and have only hortatory effect. ("If [they] are adhered to, they will inure to the benefit of the signatory companies," according to their preamble). The Guiding Principles may, however, be relevant as a guide to responsible industry practice. See *Hartford Casualty, supra,* 417 Mass. at 119, 628 N.E.2d 14. Although both First State and Utica make much of the application of the principles to this case, neither insurer comes to the table with clean hands. I also note that the principles encourage mediation or arbitration as an alternative to "the high expense and time involved" in litigation over settlement disputes.

18. "It has been held that because the primary insurer has full control over litigation and settlement negotiations, it must make reasonable efforts to negotiate a settlement and not simply reject or accept offers." P. Butler & R. Potter, *supra,* 24 Tort & Ins. L.J. at 126.

and pieces as Utica would have it, the conclusion that Utica breached its duty to Fantoni to pursue a reasonable settlement of the Joyce case is inescapable. Any reasonable insurer confronted with the investigative reports submitted by Norfield Associates in 1983 would have realized that the issue of Fantoni's liability was virtually a foregone conclusion, and that the likelihood of a judgment in excess of the policy limits was pronounced.

The opinion of Utica's lawyers was no different, from Roche & Heifitz's beginning assessment of the case to Therese Roche's persistent warnings at the end that the case was "almost impossible to defend." The Utica claims representatives most familiar with the case were of the same view, beginning, for example, with Lovering's concern in 1984 at the pitifully small reserve Utica had incurred, and culminating with his note in 1989, on the eve of trial, that the case presented a *"tough tough"* liability issue. Although Utica's position at trial was that it had valid defenses to the claims, or a reasonable expectation of at most a modestly adverse verdict, the evidence is otherwise.[19] Utica's principal legal strategy was directed at persuading the Commonwealth to shoulder some of the burden of a settlement, and not at defeating or minimizing liability. This legal stratagem, which Utica's lawyers warned had only the thinnest chance of success,[20] collapsed utterly in the fall of 1988. From that point forward, the defense case went from bad to worse. The signals sent by the trial judge of her displeasure at the lack of any serious offer on Utica's part would have been understood by any reasonable insurer as a warning of the likelihood of a rich plaintiff's verdict. (It was so understood and reported by Therese Roche). While I agree that First State has failed to show that Utica was ever presented a firm offer to settle the case within its policy limits, I conclude that Utica acted unreasonably in refusing to give its attorneys (and claims representatives) the authority to make a credible offer to the Joyces. The $30,000 that Utica in fact put on the table was tantamount to no offer at all. Even when confronted with a formal demand well in excess of its policy limits, Utica failed to make a counter-offer. "In general, a liability insurer should be required to engage as its representatives individuals who are skilled negotiators. When an offer exceeds the applicable coverage limits of a liability insurance policy a defense counsel, selected by an insurer, should be obligated [enabled] to employ that skill." R. Keeton & A. Widiss, *Insurance Law, supra* at § 7.8(d).[21]

I also find elements of bad faith in Utica's conduct. It is clear that the home office instruction to be "inflexible" in any settlement negotiations had the effect of intimidating Utica's local claims representatives into defensive inaction. Of a same piece was Utica's lack of candor with its own lawyers in withholding what limited authority the home office was willing to grant and in refusing to respond constructively to their pleas for a more realistic approach.[22] Utica's suggestion

---

19. Any suggestion that a verdict might have been reduced by a jury's finding of comparative negligence on Christopher Joyce's part is fanciful. See *Mathis v. Massachusetts Electric Co.*, 409 Mass 256, 263, 565 N.E.2d 1180 (1991). So too with any negligent parenting claim against either of Christopher's parents.

20. See *Shea v. Bay State Gas Co.*, 383 Mass. 218, 225, 418 N.E.2d 597 (1981).

21. Some of the blame for Utica's inertia, I recognize, can be assigned to the Joyces' lawyers who were remarkably lethargic in prosecuting the case.

22. First State also complains that Utica exhibited bad faith by failing to keep it properly informed of the progress of the case. This I do not find to be the case. When First State was offered the opportunity to review the Joyce file in 1984 it failed to do so despite notice from its broker agent that the case posed a risk of serious liability. It is true that when First State finally did examine the file in late September or early October of 1988, Utica did not provide its attorneys' assessments. (Utica seems to contend that Petrosino was at fault in not asking for them). This, as even Richard Pray, Utica's expert witness conceded, was a deviation from sound insurance practice. Still, First State was not lulled into any false sense of security as a result. Based on what he was shown, Petrosino came to an even more pessimistic conclusion than Therese Roche. What can be said in a positive way about Utica's obduracy is that it was not, contrary to First State's insinuations, motivated by any desire to play loose with First State's money or to protect its position with its own reinsurer. Indeed, it appears that Utica's claims representatives were, until First State asserted

that its refusal to negotiate was influenced by the advice of its lawyers has no support in the record. Compare *Van Dyke v. St. Paul Fire and Marine Ins. Co.*, 388 Mass. 671, 677, 448 N.E.2d 357 (1983). Liability in the case was "reasonably clear," as Utica's lawyers consistently maintained, and that alone should have been sufficient to inspire Utica to explore affirmatively the possibility of settlement rather than wait passively for the Joyces' lawyers to make a demand. Utica grossly undervalued the Joyce claim, set an unreasonably low reserve for settlement of the case, refused to budge from an unrealistically low offer, and invested its energies in futile entreaties of the Commonwealth for contribution. See G.L. c. 176D, § 3(9)(f). First State's contention that Utica was engaged in a deliberate bad faith strategy of "low-balling" the Joyce claim has plausible support in the record. Thus, I conclude that First State has satisfied its burden of showing that Utica was negligent, if not acting in bad faith, in its handling of the Joyce claim.

The question remains whether First State has demonstrated that it was harmed as a result. This issue is, of course, critical, because a showing of damages is an essential element of any recovery under a theory of equitable subrogation. *Patent Scaffolding Co. v. William Simpson Constr. Co.*, 256 Cal.App.2d 506, 64 Cal.Rptr. 187 (Cal.App. 1967). As a general matter, when an insurer fails to settle a claim in circumstances in which liability is "reasonably clear," thereby exposing the insured to an excess liability judgment, the damage element is satisfied. *DiMarzo v. American Mutual Ins. Co.*, 389 Mass. 85, 101–102, 449 N.E.2d 1189 (1983). The issue remains, however, whether the insurer could have settled the claim within the limits of its policy, and would have but for its own negligence or bad faith. Stated another way, is it probable, had Utica reasonably pursued a settlement as it should have, that the case would have settled within Utica's $500,000 policy limit and, if not, was the eventual settlement of $1,250,000 larger than

what might reasonably have been achieved but for Utica's misfeasance?

I conclude that First State has failed to show by a preponderance of the evidence that the Joyces would have settled the case for $200,000, or some other figure within Utica's policy limits. While Utica was negligent in failing to respond to Therese Roche's report of a $200,000 "demand" in the spring of 1988, I am persuaded that no actual demand was made, or if it was, that Eberle did not have the authority to make it. Whether Eberle had the apparent authority to make a demand, as First State argues, is beside the point. Apparent authority arises from "written or spoken words or any other conduct of the *principal* which reasonably interpreted, causes a third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *Restatement (Second) of Agency*, § 27 (1958) (emphasis added). See also *Weisman v. Saetz*, 11 Mass.App.Ct. 440, 442, 416 N.E.2d 1007 (1981); *Sheinkopf v. Stone*, 927 F.2d 1259, 1269 (1st Cir.1991). I am also persuaded that an offer of $200,000 would not have been recommended to the Joyces by David Barber. Missing conspicuously from First State's proofs at trial was any testimony from Therese Roche (although she had been deposed and was presumably available), or any testimony from the Joyces regarding their receptiveness to a more modest settlement. That the case was valued by Mardirosian & Barber well in excess of Utica's policy limits seems apparent from the fact that the firm's written demands were never less than $1,000,000 (which the firm erroneously believed to represent the full value of the Utica and First State policies), and trended up, not down, as the case proceeded to trial.

I agree with First State's argument that any competent insurer would have recognized that the case from the very beginning had the strong potential of a verdict in excess of $1,000,000. I am persuaded in this regard by the fact that almost every person who reviewed the case objectively came to the

itself on the eve of trial, largely oblivious to the existence of the excess liability policy. Similarly, the record is bereft of any evidence that Utica's managers gave any heed to reinsurance considerations or were even aware that Utica had rein-

surance protection. I base this assessment on the trial exhibits. There is no impeaching material in the documents that were produced under a claim of attorney-client privilege for in camera inspection by the court.

same conclusion. A finding of liability, as Utica's lawyers recognized, was a virtual certainty. Therese Roche, it will be recalled, estimated the likelihood of a defendant's verdict from 0 to 25 percent with a probable jury verdict (with interest) in the $800,000–$900,000 range. Ralph Petrosino, First State's adjuster, upon review of the Norfield Associates reports, and without the benefit of Roche's predictions, came to the same conclusion with an even higher estimate of a probable jury verdict ($1,500,000). John Kehoe, assessing the case in the context of an imminent trial, reached an identical judgment. I also find credible in this regard the expert testimony of Michael Mone, a knowledgeable and experienced personal injury lawyer. Mone testified that "at all times" Fantoni's exposure exceeded $1,000,000, that cases involving the death of a young child are "explosive," and that everything in the case pointed to a verdict "at the higher end of the scale." In this regard, I adopt First State's proposed findings 74, 91, 92, 97, and 98:

> 74. Even with no award for punitive damages, infliction of emotional distress, the likely damages in the *Joyce v. Fantoni* case as of the date of trial in February, 1989, greatly exceeded Utica's policy limits of $500,000. . . .
>
> 91. It is more likely than not that the jury in the *Joyce* case would have found that Fantoni was liable.
>
> 92. It is more likely than not that the jury in the *Joyce* case would have found that Fantoni was at least one percent negligent and that its negligence was one proximate cause of Christopher Joyce's death.
>
> 97. It is more likely than not that the jury in the *Joyce* case would have found in favor of the plaintiffs in excess of $1.25 million dollars, or, in the alternative, at an amount of money which would have ex-

ceeded $1.25 million dollars with 72% interest added on (i.e., approximately $729,-000 or more), or, in the further alternative, that the jury would have awarded a sum sufficiently close to $729,999 so that when 72% interest was applied, First State's choice to settle the case for $1.25 million dollars was a reasonable one.

> 98. First State settled the *Joyce* case at a reasonable figure.

I agree with the testimony of Mone and the defendant's expert witness, John J.C. Herlihy, Esq., that no reasonable insurer would have refused to settle the Joyce case for $200,000 in 1988, *if* such a demand had been made. But because I find that First State has failed to prove that it was, or if it had been, that a commensurate offer would have been accepted by the Joyces, I conclude that First State has failed to prove by a preponderance of the evidence that it suffered any damages as a result of Utica's negligence. The result First State achieved, in other words, was no worse (from Fantoni's point of view) than what would have been accomplished had Utica not been negligent in its handling of the claims.

I recognize that my conclusion is inconsistent with the posture taken by the parties at trial. Utica's position, motivated by the desire to avoid any imputation of bad faith, was that the case was never one of clear liability. Utica's stance on this issue is an after-the-fact rationalization of its conduct[23] and at odds with the historical record. First State, on the other hand, was adamant that the case from day one was headed for a verdict in excess of $1,000,000 and that any reasonable insurer would have known it. This contention, however, pivots on one essential fact, whether the case could have been settled for $200,000 in the spring of 1988 had Utica behaved reasonably. Because I conclude

---

**23.** Utica's experts argued at trial that there were factual disputes as to whether Fantoni knew that children were frequenting the site after hours and a potential defense arising from the state engineer's ratification of Fantoni's safety precautions. They also pointed out that the Massachusetts Wrongful Death Statute does not permit recovery for bereavement. Finally, they characterized the Joyce's lawyers as unprepared, unaggressive, and lacking in conviction as to the

strength of their case. With the exception of the second argument regarding possible joint liability there is no evidence in the record that any of these considerations are either true or influenced Utica's handling of the Joyces' claims. The engineer's ratification of Fantoni's safety precautions was perceived by Utica not as a defense to liability but as a possible lever for shifting a share of the liability to the state.

**1180**

that it has not been shown that the case could have been settled, First State's claim that it was harmed because it was not, collapses.[24]

■ First State's claim under G.L. c. 93A, § 11, fails for the same reason. Accepting that Utica's failure to attempt a negotiated settlement of the Joyces' claims within the limits of the primary policy amounted to a violation of G.L. c. 176D, § 3(9)(f), that "is of significance only to the extent that the alleged wrongful conduct was [also] a violation of G.L. c. 93A, § 2 ... [as] § 11 does not grant an independent right to recover for violations of G.L. c. 176D." *Polaroid Corp. v. Travelers Indemnity Co.*, 414 Mass. 747, 754, 610 N.E.2d 912 (1993). First State has failed to show that any violation by Utica of Chapter 176D caused it a loss. "In the absence of a causal relationship between the alleged unfair acts and the claimed loss, there can be no recovery [under G.L. c. 93A, § 11]." *Massachusetts Farm Bureau Federation, Inc. v. Blue Cross of Massachusetts, Inc.*, 403 Mass. 722, 730, 532 N.E.2d 660 (1989). See also *Polaroid, supra* at 755, 610 N.E.2d 912; *Williams v. Resolution GGF Oy.*, 417 Mass. 377, 384, 630 N.E.2d 581 (1994).[25]

### ORDER

For the foregoing reasons, judgment shall enter for the defendant Utica Mutual Insurance Company on all counts of the Amended Complaint.

SO ORDERED.

---

**24.** First State's contention that it suffered a "loss," in the sense that it paid the $750,000 the Joyces received over and above Utica's policy limits is true insofar as it goes. But "loss" in an insurance context does not necessarily equate to damages. First State's responsibility for the excess was exactly what Fantoni contracted for when it purchased its policy from First State.

**25.** While I have decided the case adversely to First State, I wish to compliment its lawyers for the quality of their advocacy.