**Corch Construction Co. v.
Assurance Co. of America**

C.P. of Luzerne County, no. 1250-C of 1999.

*Richard N. Shapiro* and *Stephen A. Seach,* for plaintiff.

*William K. Conklin,* for defendant Assurance Co. of America.

*Brian H. Hemak,* for defendant Billig-Helmes Insurance Associates.

CIAVARELLA, *J.,* October 28, 2003—Following a non-jury trial and in support of the attached verdict, the court hereby issues the following findings of facts and conclusions of law:

## FINDINGS OF FACTS

(1) Plaintiff, Peter Corch, was a contractor operating and doing business in the Hazleton area, having started his own construction company some time in 1971.

(2) Between 1971 and 1998, plaintiff completed between 50 and 55 construction projects with a value range of $30,000 and $1,500,000.

(3) Prior to 1998, plaintiff completed commercial construction projects including a daycare center, factory addition, warehouse, offices for an engineering firm, a laboratory and warehouse facility.

(4) Some time in and around 1985, plaintiff purchased a parcel of land between Vine Street and Route 309 in Hazleton, Luzerne County, Pennsylvania.

(5) In 1989, he built five luxury townhouses on roughly one-half of the property located between Vine Street and Route 309 in Hazleton, Luzerne County, Pennsylvania.

(6) The townhouse project was completed in 1990.

(7) Plaintiff, Peter Corch, is the owner and operator of a construction company known as Corch Construction Company Inc., co-plaintiff herein.

(8) Plaintiff, Corch Construction Company Inc., performs maintenance on the aforementioned townhouses at a cost of approximately $1,300 per year.

(9) Taxes and insurance on the aforementioned townhouses costs approximately $14,800 per year.

(10) Some time in 1997, plaintiff, Corch, began to explore the feasibility of constructing a medical office building on the unused parcel of land located between Vine Street and Route 309, Hazleton, Luzerne County, Pennsylvania.

(11) In furtherance of the medical office building project, plaintiff did preliminary designs and presented these designs to various doctors. In addition, plaintiff made a presentation to the planning commission which approved the project.

(12) Thereafter, plaintiff applied for and was granted a variance and received the appropriate building and zoning permits.

(13) Plaintiff secured bank financing from Security Savings in the amount of $480,415.

(14) Plaintiff also secured short-term financing in the amount of $314,250 from Community Development of Luzerne County. The Community Development loan was a short-term loan for the construction period and at the conclusion of construction, Security Savings would reimburse Community Development and the loan would turn into a standard adjustable mortgage with a 20-year term.

(15) The loan with Security Savings was approved by the bank's board of directors after reviewing the con-

struction specifications, blueprints, appraisal on the property and checking the plaintiffs' resources to make sure they qualified with the loan for a value and debt to income ratios.

(16) Plaintiff, Peter Corch, prior to construction of the medical arts building formed a corporation called Corch Construction Company and transferred the Vine Street property upon which the medical office building was to be built to Corch Construction. This transfer was necessitated because Community Development had a requirement that it could only consider loans to corporations, not individuals.

(17) Prior to commencing construction of the medical office building project, Peter Corch had an excellent credit rating with the various lending institutions in the Hazleton area.

(18) Plaintiffs purchased a builders risk insurance policy, no. BR94483147 from the defendant covering the construction project at the corner of West 23rd Street and Sherman Court in Hazleton, Luzerne County, Pennsylvania. The policy period was June 1, 1998 to June 1, 1999. The policy had limits of $800,000, with a $1,000 deductible and was in full force and effect in August of 1998.

(19) Under the additional coverage portion of the policy, the structure being erected was covered for a direct loss caused by, or resulting from, the direct physical loss involving collapse of all or part of the building or structure caused by, inter alia, use of defective materials or methods in construction, remodeling or renovation if the collapse occurs during the course of construction, remodeling or renovation.

(20) Plaintiffs hired various subcontractors to install the foundation and foundation walls of the medical office building, and on July 21, 1998, concrete was placed in forms which, when cured, would be the foundation walls of the building on July 21, 1998.

(21) The foundation walls system was designed by one of the subcontractors, Blue Maxx, and consisted of Styrofoam forms which would remain in place after the concrete cured. The foundation walls system was designed for the use of wood forms in the window and door locations which could be removed after the concrete hardened.

(22) The beam pockets and joist pockets also had wood forms and wooden blocks in place that were to be removed after the concrete hardened. After the concrete was poured and hardened, the plaintiff removed some of the wooden door jambs which revealed honeycombing in the concrete which at first did not appear to be severe. On August 17, 1998, as soon as plaintiff discovered a problem with the foundation wall he notified his insurance agent, Donna Barna, to apprise her of the foundation wall condition. Plaintiff again spoke with Ms. Barna on August 22, 1998, to advise her that the problem with the foundation walls involved improper work performed by the subcontractors and at that point he needed to put in a claim as the problem was much more severe and serious than originally thought.

(23) On August 24, 1998, Ms. Barna reported this claim under the builders risk policy to the defendant, Assurance Company of America. At that time she was told there was no coverage under the builders risk policy be-

cause there was an issue of workmanship. Based on this representation from Assurance Company of America, she referred plaintiffs' claim to their liability carrier.

(24) On August 25, 1998, Ms. Barna faxed, pursuant to the instructions given to her by defendant's builders risk office, the report of the claim to the defendant's commercial general liability office, indicating that the client should be contacted as soon as possible because the construction job and job site was shut down due to the problems encountered with the concrete foundation. The facts included a detailed letter concerning the problems on the job site and requested the insurance company contact the plaintiff as soon as possible because "he does have contracts with individuals who will be renting space in his building when completed in April of 1999."

(25) Plaintiff, in an effort to determine the root cause of the foundation problem and whether or not it could be corrected, retained the engineering firm of Alfred Bensch & Company on August 24, 1998. Dominic Yanuzzi P.E., was sent by Alfred Bensch & Company to the job site to investigate the concrete problem. In a report dated August 31, 1998, Mr. Yanuzzi concluded that the foundation wall failure was the result of poor workmanship and use of defective materials by the subcontractors. Mr. Yanuzzi in his report noted that "numerous concrete sections collapsed away from the wall when the Bluemaxx forms were cut and the concrete was exposed."

(26) On September 2, 1998, a copy of Mr. Yanuzzi's report was faxed by Ms. Barna to the defendant together with a cover sheet requesting the defendant to "please contact our insured as soon as you can."

(27) Ms. Barna attempted once again on October 6, 1998, to report this claim to the defendant's builders risk office, and was again advised that this was a workmanship issue and there would be no coverage under the builders risk policy.

(28) Notwithstanding this information, Ms. Barna again submitted the claim to the builders risk, which she did by way of letter dated October 8, 1998.

(29) On October 9, 1998, plaintiff, Peter Corch, gave a recorded statement to the defendant. In his statement he informed the defendant's representative that when the forms were removed, the foundation started to collapse away in very large chunks. He also explained the urgency of the problem in that the job site was shut down and that it was working a financial hardship on him and his company.

(30) Ms. Barna's October 8, 1998 letter to defendant's builders risk department, wherein she advised that she had previously reported this claim under the builders risk policy, could not be found in defendant's builders risk claim file.

(31) Nino Giacomini, defendant's claim professional, received notice from defendant of plaintiffs' claim on October 22, 1998.

(32) None of defendant's employees and/or witnesses were able to explain how a claim that was submitted on behalf of plaintiffs by Ms. Barna on August 24, 1998, did not come to the attention of defendant's builders risk department until October 21, 1998.

(33) On October 23, 1998, Mr. Giacomini spoke to a representative from defendant's liability office who stated

he would send his investigation to Mr. Giacomini. In that conversation, a discussion was held concerning an engineering report which indicated numerous concrete sections collapsed away from the wall and due to this defective condition, imminent collapse of the entire wall would occur. Mr. Giacomini also noted, "it appears coverage will apply under collapse."

(34) On October 27, 1998, Mr. Giacomini went to the loss site and noted that the foundation wall is "actually falling apart." "There are eight areas where two to three foot plywood is nailed into the wall preventing further falling out of materials in that the headers and two of the openings show it clear where concrete had fallen out and that concrete is coming out like popcorn falling apart and some pieces are football size."

(35) On October 29, 1998, Mr. Giacomini's supervisor, Michael Marsalla, and Mr. Marsalla's supervisor, Howard Tiger, reviewed the file and noted "the policy's collapse coverage would not apply as the wall has not collapsed."

(36) Even though the policy talks of collapse or partial collapse, there is no mention anywhere in the claims file or notes whether a partial collapse was even considered when Messrs. Marsalla and Tiger reviewed the file. The information in the file at the time of their review included the Yanuzzi report indicating a partial collapse together with the plaintiff's oral statement indicating the collapse and Mr. Giacomini's note indicating a collapse.

(37) When Mr. Giacomini visited the construction site he took pictures of the condition of the foundation wall, but for some unknown reason these photos were miss-

ing from the claims file and the defendant's employees had no explanation as to why they were missing and defendant's employees further testified it would be inappropriate to permanently remove these photos from the claims file.

(38) Defendant retained an engineer, Russell Daniels, after the meeting between Messrs. Marsalla and Tiger where it was decided the collapse provisions would not apply. Mr. Daniels' report dated November 12, 1998, was based upon an inspection of the job site which occurred on November 9, 1998. He was asked by defendant to determine the cause of the honeycombing of the walls and its effect on the structural integrity of the walls. The report was stamped and received by the defendant on November 16, 1998.

(39) Mr. Daniels concluded that the failure of the foundation wall was due to the poor workmanship and use of defective materials by the subcontractors. He gratuitously adds that the foundation walls have not collapsed, but makes no mention as to whether or not parts of the walls had collapsed.

(40) Mr. Marsalla claims that after receiving the report of Russell Daniels he had a second conversation with Mr. Tiger about the coverage provisions and at that time discussed the status of the case law in Pennsylvania with regard to collapse and thereafter decided that plaintiffs' claim would be denied.

(41) Mr. Marsalla was unable to point to any "z-note" or memorialization in the claims file that this second meeting ever occurred and was unable to identify any case or cases that he claimed to have reviewed with Mr.

Tiger concerning Pennsylvania case law relative to collapse. The claim file contained no documentation nor could any documentation be discovered by defendant that Messrs. Daniels or Tiger had a meeting and discussed the status of the case law in Pennsylvania with regard to collapse.

(42) The court finds as fact that Mr. Marsalla was not credible and the court believes that a second meeting with Mr. Tiger after receiving the report of Mr. Daniels did not occur nor did Messrs. Marsalla and Daniels review any case law concerning the law of collapse in Pennsylvania. Because the court finds Mr. Marsalla's testimony not to be credible, it specifically rejects same and finds that without any documentation in the claim file to substantiate the events alleged to have occurred relative to the defendant's investigation, that defendant's employee's testimony lacks credibility that it is totally unbelievable.

(43) The court found the expert testimony of Barbara Sciotti to be credible and worthy of belief.

(44) The court finds that Messrs. Marsalla and Tiger denied plaintiffs' claim notwithstanding the fact that the only information contained in the file at the time of their denial, October 29, 1998, would lead a reasonable person to conclude there had been a collapse of part of the plaintiffs' wall structure.

(45) As of October 29, 1998, Mr. Giacomini was unable to point out anything in the claim file that would indicate the wall had not collapsed or at least suffered a partial collapse.

(46) Defendant sent a disclaimer letter to plaintiff dated November 25, 1998. The credible testimony causes this

court to find this letter was written prior to that date and prior to receipt of Russell Daniels' engineering report. This belief is based upon the fact that Mr. Giacomini, on November 16, 1998, faxed a copy of Mr. Daniels' report to Mr. Tiger and in the fax cover sheet notes he was sure Mr. Tiger will wish to discuss the disclaimer letter.

(47) There is no evidence in the "z-notes," or physical claim file of the defendant indicating there was anything other than a collapse of part of the plaintiffs' structure. Specifically, Mr. Daniels' report merely states the "basement walls have not collapsed," but is silent concerning a collapse of part of the building's walls.

(48) A review of numerous photographs, a videotape of the foundation walls, as well as the architects drawing of the Blue Maxx foundation walls and plaintiff's testimony where he described no less than 16 parts of the structure collapsed upon removal of the wood forms in the joists and beams clearly and unequivocally demonstrates a partial collapse of the structure in question.

(49) The court accepts as credible the plaintiff's testimony concerning the collapse of numerous parts of the structure and finds the collapse of the window headers particularly demonstrative of a partial collapse of the structure.

(50) The plaintiff suffered a collapse of numerous parts of its structure as a result of the use of defective materials and methods in construction by its subcontractors.

(51) All of the engineering experts in this case, both plaintiff and defendant, concluded that what remained standing of the foundation walls lacked structural integ-

rity and that backfilling or applying loads would cause the remains of the foundation to completely collapse.

(52) As a result of the use of defective materials and methods in construction by subcontractors, numerous parts of the foundation collapsed leaving what remained unrepairable and unusable.

(53) Plaintiffs acted appropriately, prudently, and employed safe construction practices by shutting down the project once the seriousness of the foundation wall became apparent and by immediately calling in experts to determine the feasibility of repair. Once it was determined that repairs were not feasible, the plaintiffs promptly arranged to remove what remained of the old walls and construct a new foundation.

(54) The court finds as a fact that this loss involved a partial collapse of numerous parts of the plaintiffs' structure which was caused by the subcontractors use of defective materials and methods in construction.

(55) The court further finds as fact that the defendant had no reasonable basis to deny plaintiffs' claim and knew it had no reasonable basis for denial.

(56) Defendant, Assurance Company of America, breached its contract of insurance with the plaintiffs.

(57) Defendant, Assurance Company of America, acted in bad faith in failing to timely accept the report of the plaintiffs' claim under its builders risk policy and timely investigate and pay this claim when it became undeniably clear from all of the evidence that the plaintiffs suffered a covered loss in that there was a partial collapse of part of the building or structure due to the use of de-

fective materials and methods in construction by the subcontractors.

(58) The plaintiffs incurred costs in the amount of $132,027 attempting to repair the original walls and when that became impossible, to remove what remained of the existing foundation and install a new foundation.

(59) Under the policy of insurance which was in effect between plaintiffs and defendant, the defendant was obligated to pay for the resulting losses occasioned by the partial collapse of the foundation due to the use of defective materials and improper construction methods. Since the policy provided for a $1,000 deductible, the amount due and owed under the policy is $131,027.

(60) The defendant's bad faith refusal to pay this claim caused compensatory damages over and above the damages associated with the partial collapse of the foundation wall.

(61) The court accepts as credible the testimony of plaintiffs' economist, Royal Bunin, together with that of Joseph Correale, James Digiandominico, Dr. Anthony Ciatola, and John Synoski P.E., as well as the plaintiff concerning the damages suffered by the plaintiff due to the defendant's bad faith refusal to pay this claim.

(62) Prior to the foundation walls' partial collapse, plaintiffs had firm commitments from two physicians' groups to rent approximately 4,200 square feet in the building which was scheduled to be completed in April of 1999.

(63) When it became apparent the building would not be completed as originally scheduled, the original tenants opted out of their lease agreements.

(64) The building as originally designed and leased, called for the tenants to pay for the fit out of their individual spaces. In an effort to re-interest the original tenants and attract new tenants, the plaintiff, after consulting with Mr. Synoski and Mr. Digiandominico offered to make concessions to the tenants whereby the plaintiff, not the tenants would pay for the build out. According to Mr. Synoski, this expense to the plaintiff was in the amount of $299,369. The court finds that although this amount of money has not yet been expended, it is a firm, realistic figure and that the plaintiff will be compelled to expend that amount in order to complete and lease out this building. This item of damage is not speculative and was computed by competent and qualified individuals to cost out the build out requirements necessary to complete and lease the building in question. Based upon the testimony presented, the court concludes that if plaintiffs have any hope of completing and leasing the building, they will be required to pay for the interior fit out.

(65) Plaintiff, Corch, was forced to expend substantial sums of his own money to correct the original problem after defendant denied the claim. The delays occasioned by the defendant's mishandling of the claim and ultimate denial resulted in the original lender refusing to release approximately $160,000 remaining on plaintiffs' construction loan. Plaintiff prudently sought additional financing from two banks but was refused due to the aforementioned delays. In an attempt to save the project, plaintiff went to a secondary lender securing additional funds albeit at a higher interest rate, in the hope that once the former tenants saw progress being made, they would

once again agree to lease space. The plaintiff was optimistic that with newly signed leases he would be able to refinance the entire project with a more reasonable interest rate from a primary lender. This was an appropriate course of action since the alternative would be a failure to complete the construction project. As a result, the plaintiff incurred additional interest, origination document and underwriting fees concerning the loan he had obtained from ABC Financial Corporation in the amount of $142,375. Had the defendant timely paid this claim, no additional financing would ever have been required, hence this expense would never have been incurred.

(66) Had the defendant timely paid this claim, the medical building project would have been completed by April of 1999 or shortly thereafter. The building would have been at least partially leased and it was evident from the testimony that other tenants were interested in leasing space at this location because of its close proximity to St. Joseph's Hospital.

(67) Plaintiff's economist, Royal Bunin, conservatively estimated the loss of rental profits from the date the building would have been completed through the date of trial through the end of the original 10-year leases. The court finds Mr. Bunin's testimony concerning rental profits to be credible. The court accepts as credible Mr. Bunin's computations and calculations and in fact the court finds Mr. Bunin did not calculate any losses past the 10-year time period even though the reasonable life expectancy of the building would have exceeded 10 years.

(68) The court accepts and finds Mr. Bunin's testimony and computations to be based upon sound economic

foundation and hereby finds the plaintiff will suffer a loss of rental profits in the amount of $1,067,555 due to the defendant's bad faith refusal to pay this claim.

(69) All of the losses suffered by the plaintiffs, that being, the cost of replacing the foundation, tenants concession, additional interest, and loss of rental profits were reasonably foreseeable both at the time the insurance contract was entered into and at the time the defendant breached that contract.

(70) Throughout the entire period of time the plaintiff has attempted to restart this project by obtaining additional financing to complete the project. Attempts were also made to sell the building in an "as is" condition or to find a buyer who was willing to pay plaintiff, Corch Construction, to complete the project. Plaintiffs' efforts to market this project included listing the property with real estate professionals have been unsuccessful.

(71) The defendant was repeatedly advised by Ms. Barna and the plaintiffs, that the entire project was shut down as a result of the partial collapse of the foundation wall and this shutdown was causing severe financial problems for the plaintiffs. Assurance Company of America's denial of the claim on October 29, 1998, when all of the evidence in its files indicated a partial collapse occurred together with Mr. Marsalla's untruthful trial testimony that a subsequent meeting occurred to discuss this claim is bad faith because there is no documentation of a review of cases or that the meeting ever occurred. Moreover, reliance upon Mr. Daniels' report which is silent on a partial collapse issue is by any standard a course of outrageous conduct that must be sanctioned. As a result

of the defendant's bad faith actions in this matter, the plaintiff, Corch's 30 years of success in the construction business has been severely damaged and tainted.

(72) As a result of defendant's bad faith actions in this matter, plaintiff, Corch, was forced to leave his home and relegated to living in his office trailer, but untimely had to move from that location because he could not afford the rental for the land upon which the trailer rested.

(73) Plaintiffs were unable to continue payment on the original construction loan and the secondary loan with ABC and in November of 2002, defaulted on said loans. Plaintiff has retained bankruptcy counsel and before going into default had paid approximately $170,000 on the construction loans relative to this project.

(74) The court does not find the testimony of defendant's accountant, Mr. Pocalyko, to be credible or based upon facts which would allow him to render the opinions set forth during the course of his testimony.

(75) Co-counsel for the plaintiffs in this case, The Powell Law Group P.C., untimely submitted to the court a verified petition for payment of attorney's fees, together with a detailed exhibit listing all of the time and work done on this case, together with costs expended. The costs claimed by The Powell Law Group, should have been submitted at the time of trial where there could have been direct and cross-examination relative to the items claimed as expenses and/or costs by The Powell Law Group.

(76) The court finds that the submission for payment of attorney's fees together with listing of all time and work done on this case was not properly submitted and will not be considered by the court.

## CONCLUSIONS OF LAW

(77) The conduct of defendant was a breach of contract between plaintiff and defendant and the facts and circumstances surrounding this breach are bad faith as recognized under Pennsylvania law pursuant to 42 Pa.C.S. §8371.

(78) The Pennsylvania Bad Faith Statute provides a remedy for the bad faith conduct of insurers. The statute provides where an insurer has acted in bad faith, the insured may be awarded punitive damages, court costs and attorney's fees from the insurer.

(79) Pennsylvania law requires an insurer act with the utmost good faith towards its insured and it should accord the interest of its insured the same faithful consideration it gives its own interest. *Williams v. Hartford Insurance Company*, 83 F. Supp.2d 567 (E.D. Pa. 2000 (J)), *aff'd without opinion*, 2001 U.S. Applexis 8687 (3d Cir. April 4, 2001).

(80) Bad faith exists where the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim. Bad faith on the part of an insurer is any frivolous or unfounded refusal to pay proceeds of a policy. *Terletsky v. Prudential Property and Casualty Insurance Company*, 437 Pa. Super. 108, 649 A.2d 680 (1994). The plaintiff must prove bad faith through clear *and* convincing evidence. *Terletsky, supra.* While the statute itself does not define bad faith, case law has set forth what is necessary to prove bad faith under 42 Pa.C.S. §8371.

(81) Where an insurer's evaluation of a claim is "less than honest, intelligent, and objective," the insurer can be held liable for bad faith. *Puritan Insurance Company v. Canadian Insurance Company,* 775 F.2d 76 (3d Cir. 1985); *Cowden v. AETNA Casualty and Surety Company,* 389 Pa. 459, 134 A.2d 233 (1957).

(82) Plaintiff must prove bad faith through clear and convincing evidence, by showing that: (1) the insurer did not have a reasonable basis for denying benefits under the policy; and (2) the insurer knew or recklessly disregarded its lack of reasonable basis in denying the claim. *Terletsky, supra.*

(83) In this case, the plaintiff was the defendant's insured and therefore a heightened duty of good faith is necessary in this first-party claim situation because of the special relationship between the insurer and its insured and the very nature of the insurance contract. *Romano v. Nationwide Mutual Fire Insurance Company,* 435 Pa. Super. 545, 646 A.2d 1228 (1994).

(84) Plaintiff has proven by clear and convincing evidence that the defendant did not have a reasonable basis for denying the plaintiff's claim under the builders risk policy and defendant, Assurance Company of America, knew or recklessly disregarded its lack of reasonable basis in denying the claim. *Terletsky, supra.*

(85) Defendant, Assurance Company of America, was motivated by self-interest and ill will in the handling of the plaintiff's claim, because although its stated purpose was to look for coverage, it denied coverage despite the fact there was no evidence supporting the denial and therefore obtained an expert report in a transparent ef-

fort to support the denial. The report, however, only addresses the total collapse and is conspicuously silent as to whether or not part of the structure collapsed.

(86) The defendant, Assurance Company of America, unreasonably relied upon the expert report of Russell Daniels which in and of itself supports a finding of bad faith. *Hollock v. Erie Insurance Exchange,* 54 D.&C.4th 449 (Luzerne Cty. 2002) (Olszewski, J.); *Greco v. Paul Revere Life Insurance Co.,* 1999 U.S. Dist. Lexis 110 (E.D. Pa. 1/12/99) (Yohn, J.).

(87) Bad faith occurs when an insurance company makes an inadequate investigation or fails to perform adequate legal research concerning a coverage issue. *Hollock v. Erie Insurance Exchange, supra; Perschau v. U.S.F. Insurance Company,* 1999 U.S. Dist. Lexis 334 (E.D. Pa.); *Braccial v. Nationwide Mutual Insurance Co.,* 1993 U.S. Dist. Lexis 11606 (E.D. Pa.).

(88) The defendant, Assurance Company of America, failed to perform any legal research concerning the coverage issue. There is no documentation in any of the defendant's files citing cases it reviewed or the fact that it reviewed cases or consulted with a lawyer. This glaring lack of documentation wholly discredits Mr. Marsalla's testimony. Even at trial, Mr. Marsalla was unable to respond to the court's questioning concerning cases he claimed to have reviewed. Indeed, under the facts of this case, there is no Pennsylvania case law that supports the defendant's position concerning coverage.

(89) An unreasonable interpretation of the policy provisions as well as a blatant misrepresentation of the facts or policy provisions will support a bad faith claim.

*Hollock v. Erie Insurance Exchange, supra; Cohen v. State Auto Property & Casualty Company,* 2001 U.S. Dist. Lexis 1178 (E.D. Pa.).

(90) The court is particularly troubled that photographs taken by defendant's investigator were missing from the file and their whereabouts could not be explained at trial. Moreover, the investigator's note from the date he took the photographs of the foundation described the wall "actually falling apart," giving rise to the obvious inference that the photographs depicted the partial collapse of the plaintiff's structure and were surreptitiously removed from the file which even Mr. Marsalla admitted was inappropriate.

(91) The court accepts as credible the expert opinions rendered by plaintiff's insurance practices expert, Barbara Sciotti, concerning the defendant's bad faith conduct which included: (a) outright denial of builders risk claim by refusing to even accept the report of the claim to builders risk for a period of months; (b) ignoring the note from its investigator, Mr. Giocomini, who documents "the foundation wall is actually falling apart;" (c) ignoring the report of engineer, Dominic Yanuzzi, where he also described the walls partial collapse; (d) ignoring plaintiff's sworn statement which describes the walls partial collapse; (e) without benefit of legal opinion, without benefit of reviewing pictures, without the benefit of anything other than knowing that the evidence pointed to a partial collapse, proceeding to deny the claim; (f) forming a mindset of denial throughout the claim which is contrary to the requirements to be looking for coverage and to live up to its covenant of good faith; (g) having no reasonable basis for denying the claim and ignor-

ing the overwhelming evidence of a partial collapse due to defective materials and methods in construction which is covered under the policy; and (h) relying on the report prepared by the defendant's engineer when it is the physical appearance and what insurance law says concerning collapse that controls, especially when it appears the denial letter has been written prior to the defendant's receipt of the engineering report.

(92) The relationship and dispute between the plaintiff and defendant, Assurance Company of America, flows from their contract. *Gray v. Nationwide Mutual Insurance Company,* 422 Pa. 500, 223 A.2d 8 (1966).

(93) The defendant, Assurance Company of America, breached its contract with plaintiffs and the plaintiffs have proved this by clear and convincing evidence that the breach was in bad faith.

(94) Where an insurer acts in bad faith, the insured is entitled to recover such damages sufficient to return it to the position it would have been in but for the breach. *Birth Center v. St. Paul Companies Inc.,* 567 Pa. 386, 787 A.2d 376 (2001).

(95) An insured is entitled to recover compensatory damages based upon a contract cause of action because of an insurer's bad faith conduct. *Birth Center v. St. Paul Companies Inc., supra.*

(96) When damages are known or foreseeable and subject to calculation, the court can award compensatory damages in contract cases. The defendant knew at the time it issued the subject builders risk insurance policy that it covered a construction project for a medical building that was to be leased upon completion of construc-

tion. This was a "one shot" policy covering the project for a period of one year beginning June 1, 1998. Implicit in that knowledge is that any delay in construction would give rise to damages occasioned by the delay. Moreover, once the problem with the foundation wall occurred, the defendant was repeatedly advised by the plaintiff and Donna Barna as to the severe financial hardship the delay was causing. *Birth Center v. St. Paul Companies Inc.,* *supra.*

(97) Plaintiff has proved by clear and convincing evidence that Assurance Company of America acted in bad faith and in doing so breached its insurance contract with the plaintiff and is therefore liable for all of the compensatory damages suffered by the plaintiffs as a result of the bad faith breach of contract.

(98) Defendant, Assurance Company of America, was aware all throughout the handling of this claim of the financial pressure the plaintiff was subject to as a result of the job site being shut down as evidenced by the repeated pleas of Donna Barna to act on the claim as the job site was shut down, the recorded statement of the plaintiff explaining the financial pressure and Mr. Giacomini's preparation of a large loss notice.

(99) Plaintiff's compensatory damages sustained as a result of the defendant's bad faith breach of the insurance contract have been proven with reasonable certainty and have proved a reasonably fair basis for calculating how much the plaintiff is entitled to be awarded. *Fish v. Gosnell,* 316 Pa. Super. 565, 463 A.2d 1042 (1983); *Kaczkowski v. Bolubasz,* 491 Pa. 561, 421 A.2d 1027 (1980).

(100) The builders risk insurance contract that was in full force and effect between the plaintiff and the defendant at the time of the collapse of parts of the plaintiff's foundation wall resulted in damages in the amount of $132,026. After reducing said amount by the $1,000 deductible, the plaintiff is hereby awarded $131,026 which is the amount that would have been covered under the valuation clause of the builders risk policy.

(101) The plaintiffs have proven that as the direct and proximate result of the defendant's bad faith breach of the insurance contract, it suffered compensatory damages which were foreseeable as follows:

(a) Additional interest, orientation, document and underwriting fees associated with the ABC Loan—$142,375;

(b) Additional costs needed to pay for tenant concessions $299,369; and

(c) Loss of rental profits, past and future $1,067,555.

(102) All of the above-referenced compensatory damages were foreseeable and as a result of the defendant's conduct and were proven to a reasonable degree of certainty so that the amounts awarded can be fairly awarded from the evidence presented at trial. *Carroll v. Philadelphia Housing Authority,* 168 Pa. Commw. 275, 650 A.2d 1097 (1994).

(103) The court rejects the defendant's claim that the damages suffered by the plaintiff were caused by the negligent construction of the foundation walls. This flawed argument overlooks the entire point of the plaintiff obtaining the policy of insurance which for a premium obligated the defendant to timely investigate and

pay for a covered claim. Had it done so, by all of the credible evidence of record the project after a short hiatus would have been back on track and completed in a timely manner. It was the defendant's bad faith delay and denial of a covered claim that caused the project to stall, ultimately resulting in the damages proven at the time of trial.

(104) The plaintiffs acted reasonably and took all steps necessary to mitigate their damages. *Ecksel v. Orleans Construction Co.,* 360 Pa. Super. 119, 519 A.2d 1021 (1987).

(105) The plaintiff suffered a loss involving collapse of numerous parts of their structure caused by the use of defective materials and methods in construction.

(106) The photographic evidence, both still and video, overwhelmingly demonstrates numerous parts of the building collapse.

(107) When only part of a structure collapses and the policy provides for coverage for where a collapse of a building or any part of a building occurs, then the insurance company must pay the claim. *Norfolk & Dedham Mutual Fire Insurance Co. v. Demarta,* 799 F. Supp. 33 (E.D. Pa. 1992).

(108) The plaintiffs have proven by clear and convincing evidence that the defendant, Assurance Company of America Inc., is guilty of no less than eight instances of bad faith in handling the plaintiffs' claim under the builders risk policy and delineated in paragraph 16 of the court's conclusions of law.

(109) 42 Pa.C.S. §8371 specifically permits the award of punitive damages for bad faith.

(110) Defendant's conduct in this case warrants the imposition of punitive damages. The compensatory award in this case is based purely on the economic harm suffered by the plaintiff as a result of the defendant's bad faith breach of contract. The compensatory award does not take into consideration the reprehensibility of the defendant's conduct which has driven the plaintiffs to the brink of financial disaster all but ruining the plaintiffs Corches' 30 years of success in the construction business. This court is mindful of the United States Supreme Court's decision in *BMW v. Gore,* 517 U.S. 559, 116 S.Ct. 1589 (1996), and *State Farm Mutual Insurance Company v. Campbell,* 123 S.Ct. 1513 (April 7, 2003), and imposes a punitive damage award based solely upon the defendant, Assurance Company of America's actions or lack thereof in this case alone. The defendant's outrageous conduct evidenced by its "mindset of denial" right from the beginning in consciously disregarding overwhelming evidence of the partial collapse and thereafter obtaining a post-denial engineering report that fails in its intended purpose of substantiating denial cannot go unpunished. Equally reprehensible is the untruthful trial testimony of Mr. Marsalla that a second review of this claim took place after October 29, 1998, at which time Pennsylvania case law on the collapse issue was discussed. This willful misconduct reeked such financial havoc upon plaintiff Corch he was forced to move from his home in order to generate some rental income that could be poured back into the project. Having nowhere to go, plaintiff Corch actually lived in his office trailer for nine months until he had to move again because he could not afford the rent for the land upon which

the trailer rested. The conduct of the defendant and the impact of that conduct which continues even today, almost five years after the bad faith denial, caused a distinct harm separate from the compensatory damages. Unlike the facts in *Campbell, supra,* the nightmare for the plaintiff continues.

The defendant must therefore be sanctioned by an award of punitive damage to punish and deter defendant from acting in this manner in the future. Giving the reprehensibility of the defendant in this case and taking into consideration the Supreme Court's mandate in *Campbell, supra,* the court imposes a punitive damage award of one and one-half times the compensatory damage award in the amount of $2,460,387.

(111) 42 Pa.C.S. §8371 provides that the court may award attorney's fees and expenses where bad faith is found. The calculation of reasonable attorney's fees for bad faith by an insurer for handling a claim should begin with the actual number of hours spent in pursuing the claim multiplied by a reasonable rate. The court finds that no testimony was presented during the course of trial to substantiate an award of attorney's fees and/or costs. The court finds that absent a request to present evidence relative to attorney's fees and costs, and not having presented any evidence relative to same, no attorney's fees or costs may be granted.

## VERDICT

And now, October 22, 2003, at 11 o'clock, a.m., following a non-jury trial the court finds that plaintiffs have proven by clear and convincing evidence that defendant,

Assurance Company of America, acted in bad faith in violation of 42 Pa.C.S. §8371. The court hereby renders a verdict in favor of plaintiffs, Corch Construction Company and Peter Corch and against defendant, Assurance Company of America and awards damages to plaintiffs pursuant to 42 Pa.C.S. §8371, as follows:

| | |
|---|---|
| (1) Compensatory damages | $1,640,325 |
| (2) Punitive damages | $3,280,650 |
| (3) Attorney's fees | $0 |
| Total Verdict | $4,920,975 |

## AMENDED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

And now, October 28, 2003, due to the court improvidently indicating in paragraph 110 of its findings of facts and conclusions of law a punitive damage award totaling one and one-half times the compensatory award and in order to insert the proper percentage hereby amends finding of fact and conclusion of law paragraph 110 to indicate a punitive damage award of two times the compensatory damage award for an award of punitive damages in the amount of $3,280,650.